1

1

2

3

4                 UNITED STATES DISTRICT COURT

5               CENTRAL DISTRICT OF CALIFORNIA

6                      SOUTHERN DIVISION

7                          - - -

8        THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9

10       SOFTKETEERS, INC.,            )
                            Plaintiff, )
11           vs.                       )
                                       )  SACV-19-00519-JVS
12       REGAL WEST CORPORATION,       )
         et al.,                       )
13                          Defendants. )
         ------------------------------)

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Santa Ana, California

17                     May 6, 2019

18

19                      SHARON A. SEFFENS, RPR
                        United States Courthouse
20                      411 West 4th Street, Suite 1-1053
                        Santa Ana, CA  92701
21                      (714) 543-0870

22

23

24

25

```
1   APPEARANCES OF COUNSEL:

2   For the Plaintiff:

3   L. REX SEARS
    MASCHOFF BRENNAN
4   111 South Main Street, Suite 600
    Salt Lake City, UT  84111
5   (435) 575-1397

6   For the Defendants:

7   PAUL M. SCHOENHARD
    MARY HALLERMAN
8   MCDERMOTT WILL & EMERY, LLP
    500 North Capitol Street, NW
9   Washington, DC  20001-1531
    (202) 756-8223
10
    ELLIE HOURIZADEH
11  MCDERMOTT WILL & EMERY
    2049 Century Park East, Suite 3800
12  Los Angeles, CA  90067-3218
    (310) 551-9321
13

14

15

16

17

18

19

20

21

22

23

24

25
```

|   | 1 | SANTA ANA, CALIFORNIA; MONDAY, MAY 6, 2019; 2:00 P.M. |
|---|---|---|

```
        1    SANTA ANA, CALIFORNIA; MONDAY, MAY 6, 2019; 2:00 P.M.
02:00   2              THE CLERK:  Item No. 20, SACV-19-00519-JVS,
02:00   3    Softketeers, Inc., versus Regal West Corporation, et
02:00   4    al.
02:00   5              Counsel, please state your appearances for the
02:00   6    record.
02:00   7              MR. SEARS:  Good afternoon, Your Honor.  Rex Sears
02:00   8    on behalf of plaintiff Softketeers.  I am joined by my
02:00   9    partner Michael Katz.
02:01  10              MR. SCHOENHARD:  Good afternoon, Your Honor.  Paul
02:01  11    Schoenhard for the defendants.  I am joined by Ellie
02:01  12    Hourizadeh and Mary Hallerman.
02:01  13              THE COURT:  Good afternoon.
02:01  14              I think I would like to hear from Regal first.
02:01  15    Who is going to argue?
02:01  16              MR. SCHOENHARD:  I will, Your Honor.  Thank you,
02:01  17    Your Honor.
02:01  18              The defendants are aware of the Court's tentative
02:01  19    ruling, and it appears to us that the Court may be under a
02:01  20    misapprehension as to the general state of play between the
02:01  21    parties here.  As the Court's tentative order reads, it
02:01  22    suggests that Regal is a large corporation that will be able
02:01  23    to go forward without trouble if it does not have access to
02:01  24    the source code for the systems that operate its business.
02:01  25    That simply isn't the case.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:01　　1　　　　　　As the plaintiff here acknowledged in his opening

02:02　　2　　declaration, as Mr. Neeves noted in his responsive

02:02　　3　　declaration, and as the parties have briefed, and the Court

02:02　　4　　has noted in its tentative order, the source code itself is

02:02　　5　　essential to the ongoing day-to-day operation of Regal's

02:02　　6　　systems.  Regal is a logistics company.  It depends on its

02:02　　7　　systems in order to operate on a day-to-day basis.  Its

02:02　　8　　customers need to access its systems in order to make sure

02:02　　9　　that their goods are properly warehoused, properly

02:02　　10　　transported, that the inventories are maintained.  Regal

02:02　　11　　cannot operate without its system.

02:02　　12　　　　　　The system itself as Mr. Nguyen and various of the

02:02　　13　　defendant programmers have programmed system requires near

02:02　　14　　constant updating, as Mr. Nguyen and Mr. Neeves both

02:02　　15　　declare.  Many things that frankly in modern coding probably

02:02　　16　　should be housed in separate databases so that a code can be

02:02　　17　　more dynamic are hard coded into the software in this case.

02:03　　18　　　　　　The upshot of that is that it really makes no

02:03　　19　　sense and it would be unreasonable to assume that Regal

02:03　　20　　would have ever entered into a contract by which the IT

02:03　　21　　folks that it employed over a period of years if there was

02:03　　22　　ever a time where they were to part ways would be able to

02:03　　23　　take Regal's entire business functionally and walk out the

02:03　　24　　door with it.

02:03　　25　　　　　　Rather, Regal hired a set of developers to develop

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:03  1  custom software.  This isn't off-the-shelf software.  This
02:03  2  isn't software that is copied and distributed out into the
02:03  3  industry to the customers.  It is custom software for Regal
02:03  4  so that Regal could maintain and operate its business.
02:03  5      Prior to this work, as Mr. Neeves included in his
02:03  6  declaration, Regal had a different software platform that it
02:03  7  was time to update.
02:03  8      THE COURT:  How many years ago was that?
02:03  9      MR. SCHOENHARD:  That was in the 1980s and '90s.
02:04  10  Regal then went ahead and hired first a company called Ellis
02:04  11  USA to update that software.  Ellis USA agreed with Regal
02:04  12  that Ellis would provide the source code, would provide
02:04  13  everything, would make sure their software was up and
02:04  14  running, was functioning as a day-to-day employee of Regal.
02:04  15      When things went south with Alis, one of the
02:04  16  contractors working with Alis was Mr. Nguyen.  Now, in
02:04  17  Mr. Nguyen's second declaration, he testified that he wasn't
02:04  18  hired by Alis-USA.  Had we had the opportunity to rebut that
02:04  19  second declaration or cross-examine Mr. Nguyen, we would
02:04  20  establish that in litigation about ten years ago Mr. Nguyen
02:04  21  admitted that he was hired by Alis-USA.
02:04  22      In fact, all of this stems from a project that
02:04  23  began in the late 1990s to have a series of contractors come
02:04  24  in at Regal's behest to develop strictly for them a
02:05  25  customized software platform that would operate their

02:05    1   business know-how in the background of an automated

02:05    2   platform.  That has been the case for an ongoing period of

02:05    3   years.

02:05    4          The Court appears to note as a particularly

02:05    5   significant fact Mr. Nguyen's failure to deliver source code

02:05    6   to Regal on any regularized or ongoing basis.  This of

02:05    7   course is concerning to Regal as Regal requires the source

02:05    8   code in order to make their systems work day after day after

02:05    9   day.

02:05   10          Historically, while the relationship was friendly

02:05   11   between Mr. Nguyen and the team at Regal, this was not a

02:05   12   major issue.  Most of the staff on Regal are not themselves

02:05   13   software engineers.  They have no need day to day for the

02:05   14   source code as long as they have on staff one or more

02:05   15   software engineers who can update it.  Until recently, the

02:05   16   people they had on staff included Mr. Nguyen, so it was not

02:06   17   an issue.

02:06   18          If we take these facts and turn then to how they

02:06   19   play out in the Court's tentative order, there are several

02:06   20   things that become particularly problematic.  First, the

02:06   21   Court addresses whether the software at issue should be

02:06   22   considered a work for hire of Regal.  I respectfully

02:06   23   disagree with the Court's tentative outcome here.

02:06   24          In particular, the Court seems to focus on whether

02:06   25   Mr. Nguyen and others were nominally employees for

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:06  1    employment law purposes.  As Mr. Neeves declared in his

02:06  2    declaration, he was the one who actually assigned projects

02:06  3    not just to Mr. Nguyen and certainly not to Softketeers as

02:06  4    an entity but, rather, that he directed assignments to

02:06  5    Mr. Nguyen and to the other developer programmers, many of

02:06  6    which are named as defendants in this case.

02:06  7            He also declared in paragraph 17 of his

02:06  8    declaration that he was the one who managed day to day in

02:07  9    many cases the work of the independent contractors.  It was

02:07  10   after all Mr. Neeves who had the business know-how and the

02:07  11   legacy know-how of their proprietary system --

02:07  12           THE COURT:  Did Mr. Neeves have the technical

02:07  13   know-how to upgrade the code, to write code, to modify it?

02:07  14           MR. SCHOENHARD:  No, sir.  That is why he hired

02:07  15   software developers to do this.  As the Supreme Court made

02:07  16   clear in Reed, hiring for purposes of creation of a creative

02:07  17   work subject to copyright is not a function of whether there

02:07  18   is an IRS form that is given or whether the person is a

02:07  19   formal employee for state employment purposes.  The question

02:07  20   is the nature of the relationship and whether functionally

02:07  21   direction is given in a manner that would suggest an ongoing

02:07  22   employment relationship.

02:07  23           Here exactly that sort of relationship is in play.

02:07  24   The various independent contractors were paid on an hourly

02:07  25   basis.  This was not a lump sum fee for provision of a

```
02:07    1    deliverable.  Rather, it was you are our IT team.  The folks
02:08    2    who ultimately invoiced through Sofketeers as a pure
02:08    3    financial purpose were responsible for building the website
02:08    4    for Regal, which is not an issue here.
02:08    5            Had I had the opportunity to cross-examine
02:08    6    Mr. Nguyen, I would be able to cross-examine him on which of
02:08    7    the various developers were actually at Regal's behest and
02:08    8    under the direction of Regal employees creating and updating
02:08    9    the Regal website on a day-to-day basis.  Functionally,
02:08   10    these were people were day-to-day Regal employees for
02:08   11    copyright purposes but for state law purposes were being
02:08   12    hired on as independent contractors.
02:08   13            Once we get past work for hire -- I do of course
02:08   14    acknowledge that in defendants' opposition brief we laid out
02:08   15    a series of arguments on the ownership thing.  This sadly is
02:08   16    unsurprising given that we have an 18 to 19-year history of
02:09   17    what probably could have been fixed by a contract nearly two
02:09   18    decades ago.  I think we could all recognize that had there
02:09   19    been a written contract in place the remainder of this
02:09   20    dispute would likely just go by the wayside.  But we don't,
02:09   21    so we need to look at the course of dealings and unravel
02:09   22    them to try to discern what the best legal pigeon hole is in
02:09   23    which to place them.
02:09   24            The next item we then hit if the Court is not
02:09   25    convinced that in fact for purposes of the Supreme Court's
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:09   1   Reed assessment that the various independent contractors
02:09   2   were in fact Regal employees and thereby make the software
02:09   3   work for hire, we then of course get to the individual
02:09   4   employees' independent contractor agreements.  On this, I
02:09   5   would like to focus the Court's attention on one particular
02:09   6   item in the tentative order, that being the language that
02:09   7   the Court has helpfully quoted from the various independent
02:09   8   contractor agreements in the tentative order.  As I have it,
02:09   9   that's spans pages 9 to 10.
02:10  10          Significantly, this clause concludes as work for
02:10  11   hire.  Work for hire has a very specific meaning in
02:10  12   copyright law.  Work for hire is when you are actually
02:10  13   creating a work for hire agreement by which an independent
02:10  14   contractor would effectively transport to the other side,
02:10  15   the other party, the counter party of the contract.  The
02:10  16   authorship interests and ownership rights in the first
02:10  17   instance is a work for hire.
02:10  18          As the plaintiff here acknowledges or argues in
02:10  19   their reply brief, software is not understood to fall within
02:10  20   one of the nine categories of copyrightable materials that
02:10  21   qualify for the work for hire doctrine.  This clause, a work
02:10  22   for hire clause, does not affect any work for hire of the
02:10  23   software.
02:10  24          Moreover, it does not qualify as an assignment of
02:11  25   any copyrighted information.  Rather, as it lays out, it

02:11  1  does not use anywhere the term "assign."  It is not written

02:11  2  in present language.  It is written in future language.  It

02:11  3  says "shall become," future tense language, which courts

02:11  4  readily recognize as insufficient to in fact convey rights

02:11  5  at the present time.  At best, this is an agreement to agree

02:11  6  even if it would qualify as something that would be an

02:11  7  agreement to agree to an assignment.

02:11  8        And the fourth failing of it -- and there are

02:11  9  four, again, work for hire; two, the lack of assignment

02:11  10  language; three, prospective language; four, it does not

02:11  11  sufficiently specify what the copyrighted material is that

02:11  12  would be conveyed.  This of course is not surprising as it

02:11  13  is written in prospective language.  Something written in

02:11  14  present tense language is typically better suited to in fact

02:11  15  convey something specific.

02:12  16        Now, this is not the only time the Court has ever

02:12  17  had to deal with writings of this sort.  I direct the

02:12  18  Court's attention, for instance, to the Effects decision of

02:12  19  the Ninth Circuit and the Gladwell nonprecedential decision

02:12  20  of the Ninth Circuit, both of which comment on the writing

02:12  21  requirement of Section 204 and recited in the parties'

02:12  22  briefs.  There is also a Northern District of California

02:12  23  decision Identity Arts that may also be instructive when it

02:12  24  comes to use of the words "assign" or "transfer" and whether

02:12  25  the works are properly identified.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:12  1          On the ownership issue, I turn next to the issue
02:12  2   of implied license.  I acknowledge that in the Court's
02:12  3   tentative order there is a suggestion that because there was
02:12  4   no delivery of the source code then there could not be a
02:12  5   reasonably implied license to the source code.  I
02:12  6   respectfully submit that's the wrong starting point.
02:13  7          Here I think there is no and should not be any
02:13  8   question that even absent an ownership stake -- and I truly
02:13  9   believe there is one -- but even absent an ownership stake,
02:13 10   there is at minimum a vested nonexclusive implied license to
02:13 11   the software itself.  One must then ask what is the scope of
02:13 12   that implied license to the software itself?  Surely
02:13 13   Mr. Nguyen can't argue that Regal is not allowed to use the
02:13 14   software that it has paid for 18 years to have built and
02:13 15   developed the second it decides to part ways with him.  That
02:13 16   can't be the outcome here.
02:13 17          So the question is what is the bundle of rights
02:13 18   conveyed as part of any implied license?
02:13 19          THE COURT:  It's your position that a perpetual
02:13 20   license was conveyed>
02:13 21          MR. SCHOENHARD:  Most certainly.  We have delivery
02:13 22   of the source code that was specifically --
02:13 23          THE COURT:  No, we don't have delivery of the
02:13 24   source code.
02:13 25          MR. SCHOENHARD:  We have delivery of the software

| | |
|---|---|
| 02:13 | 1 |
| 02:13 | 2 |
| 02:14 | 3 |
| 02:14 | 4 |
| 02:14 | 5 |
| 02:14 | 6 |

02:13  1  in executable format for the business purpose that it was

02:13  2  created at the specific direction by Regal and a payment by

02:14  3  Regal on an hourly basis over an extended period of time.

02:14  4  At minimum, there is an implied license to that software.

02:14  5  The question then becomes what bundle of rights would be

02:14  6  conveyed with such an implied license?

02:14  7         As both parties agree, this software necessarily

02:14  8  is updated on a regularized basis.  Otherwise, the software

02:14  9  itself is rendered valueless.  Regal cannot maintain its

02:14  10  business in an ongoing fashion if the software is not

02:14  11  updated when a new customer comes on board.  When a customer

02:14  12  changes a simple thing as a contact e-mail address, these

02:14  13  items need to be updated within the source code.  It would

02:14  14  be necessary then that any implied license to the software

02:14  15  must necessarily reach the code for the software because the

02:14  16  code itself is rendered meaningless if the attendant rights

02:14  17  of use, retain, and modify for the source code do not come

02:14  18  along with it.

02:15  19         If we turn away from the ownership and license

02:15  20  issues, on the issue of irreparable harm, I believe here

02:15  21  respectfully the Court has simply gotten it wrong.  Here

02:15  22  Softketeers cannot show any irreparable harm that the

02:15  23  preliminary injunction that is sought could remedy.  And

02:15  24  it's that last factor, whether the preliminary injunction

02:15  25  sought could in fact remedy the irreparable harm, that is

02:15  1  particularly significant here.

02:15  2  If a preliminary injunction is put into place,

02:15  3  then within a relatively near term Regal will need to

02:15  4  decrease its business and may ultimately fail.  That does

02:15  5  not help Sofketeers.  That does not cure any potential harm

02:15  6  Sofketeers may have.  Sofketeers does not benefit from Regal

02:15  7  failing, nor does Softketeers reasonably suggest that there

02:15  8  is any other customer out there for a Softketeers system

02:15  9  that was custom built for Regal based on Regal's proprietary

02:16  10  processes and know-how.  So there is nothing as to Regal's

02:16  11  ongoing use of this software that if Regal is enjoined would

02:16  12  in any way alleviate the harm that Softketeers claims.

02:16  13  THE COURT:  What about the issue of the dilution

02:16  14  of Softketeers' rights, namely, things get fuzzier and

02:16  15  fuzzier and fuzzier to the extent that the software evolves

02:16  16  and the strict line between what is Softketeers' and what

02:16  17  may or may not be Regal's gets clouded in an increasing

02:16  18  fashion every time they go along and revise the software

02:16  19  that they have in their hands that Regal has?

02:16  20  MR. SCHOENHARD:  If Regal were not to do so, again

02:16  21  Regal would not exist, but I can appreciate --

02:16  22  THE COURT:  Not the question.

02:16  23  MR. SCHOENHARD:  I apologize.  I again appreciate

02:16  24  the idea of a dilution aspect, but (a) it is really quite

02:17  25  easily by a simple comparison of source code to identify

14

02:17   1   what was in existence at the time when the source code was
02:17   2   allegedly taken improperly and at any -- then present time.
02:17   3   It is also a simple factor of assigning damages to any
02:17   4   wrongful use of source code.
02:17   5        But whether it is difficult to unwind how much
02:17   6   ongoing value is derived, that's something that economists
02:17   7   do for damages purposes all the time.  That doesn't
02:17   8   alleviate any harm to Sofketeers today.  There is nothing
02:17   9   that Sofketeers will have as a relief from a preliminary
02:17   10  injunction aside from spite, and that's not a good reason to
02:17   11  grant preliminary injunctive relief.
02:17   12       The Court's suggestion that Regal would be boxed
02:17   13  into a corner and would need to rehire Mr. Nguyen I think is
02:17   14  not a reasonable suggestion.  First, I'm unaware of any
02:17   15  legal precedent for the notion that the resolution for -- or
02:17   16  a proper outcome for a preliminary injunction among civil
02:18   17  parties is for them to reenter into a contractual
02:18   18  relationship, but especially as here where the contractual
02:18   19  relationship failed because there was a loss of trust
02:18   20  between Regal and Mr. Nguyen where Regal believed that
02:18   21  Mr. Nguyen was defrauding it and where ultimately Regal
02:18   22  believed that Mr. Nguyen had stolen Regal's trade secrets
02:18   23  and was using them for yet a separate business operated by
02:18   24  Mr. Nguyen, which is the subject of another lawsuit that has
02:18   25  now been filed in the Western District of Washington between

02:18  1   Regal and Mr. Nguyen for his wrongful taking of their data

02:18  2   for other purposes.

02:18  3        Here there really is nothing that could help

02:18  4   Mr. Nguyen, and it's not reasonable to assume that he would

02:18  5   be rehired by Regal now or at any time in the future.  But

02:18  6   if we tip the balance of the hardships, to have Regal face

02:18  7   the prospect of having to shut down its business, it puts it

02:19  8   right back in the holdup scenario that Mr. Nguyen tried to

02:19  9   force it into in the first place, which is although you have

02:19  10  contracted for software, paid me for software for many

02:19  11  years, I am going to hold you over a barrel and not give you

02:19  12  what you need in order to use it with anybody else.

02:19  13       Two final items -- I appreciate your forbearance

02:19  14  with me this afternoon.  There are two items that I don't

02:19  15  think were addressed in the Court's tentative order that we

02:19  16  would need clarity on.  In the event the Court is inclined

02:19  17  to enter a preliminary injunction despite my arguments

02:19  18  today -- and I urge the Court not to -- we would need to

02:19  19  address the issue of a bond.

02:19  20       Here we face the prospect that Regal needs to

02:19  21  functionally wind down its business in the relatively near

02:19  22  future if it is unable to actually use and modify the source

02:19  23  code it needs to keep its systems up and running.  That

02:19  24  would require a significant bond from Mr. Nguyen's end in

02:20  25  order to account for possible damages in the event that the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:20  1   injunction was determined to have been wrongly entered and

02:20  2   Regal prevails at the end of this litigation.

02:20  3          The other item outstanding is in fact the scope of

02:20  4   the injunction being requested by Mr. Nguyen and Sofketeers

02:20  5   is in my view a little bit vague as ultimately is the

02:20  6   tentative order of this Court in that Mr. Nguyen and

02:20  7   Sofketeers have identified various works that are the

02:20  8   subject of registered copyrights.  We would expect that --

02:20  9   would understand that Your Honor's tentative order was

02:20  10  intending to target those works as the source code works

02:20  11  that would be the subject of a preliminary injunction, but

02:20  12  Mr. Nguyen and Sofketeers have also alleged the existence of

02:20  13  other source code that is not yet the subject of registered

02:20  14  copyright.

02:20  15         Of course there could be no valid claim for

02:20  16  copyright infringement as to those works at this point in

02:21  17  time in view of, for example, the Supreme Court's recent

02:21  18  decision in Fourth Estate.  As a result, a preliminary

02:21  19  injunction if entered certainly must be narrowly crafted so

02:21  20  as to carve out such works that are not properly within the

02:21  21  scope of this litigation.

02:21  22         Thank you, Your Honor.

02:21  23         THE COURT:  Thank you.

02:21  24         Mr. Sears.

02:21  25         MR. SEARS:  Thank you, Your Honor.

02:21  1          Taking up counsel's points in order, first a
02:21  2    general note, we heard counsel testifying a lot about facts
02:21  3    that are not simply in the record.  We heard new arguments
02:21  4    that could have been presented in opposition briefing that
02:21  5    were not.
02:21  6          Setting that aside, let's take counsel's starting
02:21  7    point as described today and testified to today by counsel
02:22  8    from the podium, that it wouldn't a make sense for Regal to
02:22  9    have engaged -- or, rather, had this 18-year relationship
02:22 10    with Sofketeers and at the end of which Regal does not own
02:22 11    the source code.
02:22 12          Counsel is overlooking the most salient point,
02:22 13    which the Court's tentative does identify, which is through
02:22 14    18 years source code was never delivered.  Through 18 years
02:22 15    Regal twice tried to buy source code and joint ownership.
02:22 16    If they are trying to buy joint ownership and source code,
02:22 17    that means they don't have even joint ownership, let alone
02:22 18    full ownership.  They have no ownership, and they have no
02:22 19    source code.  So if we want to look at what makes sense,
02:22 20    there is an 18-year course of dealing that clearly shows
02:23 21    only one interpretation.  That is the interpretation that
02:23 22    Regal is in precisely this situation.
02:23 23          As to this idea that Mr. Nguyen put together this
02:23 24    doomsday scenario to hold Regal up, the only facts in the
02:23 25    record are that Regal severed the relationship

02:23  1   precipitiously and as retaliation for Sofketeers not

02:23  2   knuckling under to an unreasonable demand.  That's big

02:23  3   picture.

02:23  4            THE COURT:  But isn't the usual consequence if one

02:23  5   is proceeding on licensed software, however important it is

02:23  6   to the business, if the license legitimately terminates,

02:23  7   yes, there may be harm to the business, but is that harm

02:23  8   caused by the holder of the license?  I don't think so.

02:23  9            MR. SEARS:  I agree.  Yes, absolutely.  The harm

02:23  10  is caused by the party who didn't get better terms going in.

02:24  11  Regal had a chance to buy source code and buy joint

02:24  12  ownership for $1.5 million in 2011.  They passed up that

02:24  13  chance.  So, yes, that harm is not being done by my client.

02:24  14  Whatever harm there is -- and there is no evidence in the

02:24  15  record of that harm -- whatever that harm is, yes, it's not

02:24  16  attributable to the licensor.

02:24  17            I don't know which of the other points that were

02:24  18  raised that the Court considers most salient.  I will start

02:24  19  walking through them in order, but I welcome the Court's

02:24  20  direction if I should go in a different direction.

02:24  21            We heard a repeat of the argument that there

02:24  22  were -- that these -- the software at issue is a work for

02:24  23  hire.

02:24  24            THE COURT:  I'm satisfied it isn't.

02:24  25            MR. SEARS:  Then in terms of the sufficiency of

02:24  1    the contractual assignment, would the Court care to hear a

02:25  2    response on that new argument?

02:25  3            THE COURT:  Please.

02:25  4            MR. SEARS:  Again, I don't have the benefit and

02:25  5    the Court doesn't have the benefit of having this fully

02:25  6    briefed because it was not raised in the opposition.  Let me

02:25  7    quote that language.  Pages 8 to 9 I think were identified

02:25  8    -- pages 9 to 10, excuse me.

02:25  9            Counsel points out first that the assignment

02:25  10   provision of the contract uses the term -- concludes with

02:25  11   the term "work for hire."  Now, in point of fact, both

02:25  12   parties have recognized in their briefing that software is

02:25  13   not one of the nine categories of works that can be a work

02:25  14   for hire.  So the phrase "work for hire" here does not work.

02:25  15   The phrase "work for hire" here -- the important language is

02:25  16   what precedes that, that the "source code, object code, or

02:26  17   other related documents and materials shall become and

02:26  18   remain the property of Sofketeers."

02:26  19           Now, the fact that a lay person putting together a

02:26  20   contract without the advice of counsel stuck on the words

02:26  21   "work for hire" does not change the clear import of the

02:26  22   agreement.  It is the case that it is very difficult to have

02:26  23   a work for hire agreement unless you have that exact phrase

02:26  24   in there, "work for hire."  I am unaware of any authority

02:26  25   for the proposition that unnecessarily including the phrase

02:26  1   "work for hire" will somehow defeat an otherwise valid

02:26  2   assignment.  So the presence of the words "work for hire"

02:26  3   there is simply beside the point.  It doesn't change the

02:26  4   fundamental nature of this contractual provision which is an

02:26  5   assignment.

02:26  6         Counsel picked up on the fact it doesn't say

02:26  7   "assignment."  Now, I noted that there is legal authority

02:27  8   for the proposition that you better use the phrase "work for

02:27  9   hire" or something like that if that's what you intend.  I

02:27  10  am unaware of any authority that says there is something

02:27  11  magical about the word "assign."  There has to be language

02:27  12  that conveys an intent to assign copyright.

02:27  13        Here we have -- this provision starts off, "All

02:27  14  rights, title, interest, copyright, or other intellectual

02:27  15  property interests which were developed by the consultant

02:27  16  for Sofketeers under this agreement, including source code,

02:27  17  object code, and other related documents and materials shall

02:27  18  become and remain the property of Sofketeers."  The word

02:27  19  "assign" does not appear in there.  It's pretty clear that

02:27  20  an assignment is what is intended.

02:27  21        Counsel also picked up on the tense.  Counsel is

02:27  22  confusing different lines of authority.  There is a line of

02:27  23  authority in the patent realm that says an agreement -- a

02:28  24  prospective agreement to assign -- that is, an agreement

02:28  25  that says the employee shall assign -- that is treated as a

02:28   1   promise to do something different.  There's no promise on
02:28   2   the part --  there is no description here of what the
02:28   3   employee will do.
02:28   4          The language instead operates on the subject
02:28   5   matter, and the language says that the subject matter "shall
02:28   6   become and remain."  The reason it says "shall" is we are
02:28   7   talking about works to be created.  But the important point
02:28   8   here is that the line of authority that counsel was citing
02:28   9   that latches onto language about "shall assign" is language
02:28   10  that describes the future conduct of the employee.
02:28   11         This language does not reference the future
02:28   12  conduct of the contract.  This language describes the
02:28   13  subject matter.  It says that that subject matter shall upon
02:29   14  creation become and remain the property of Sofketeers.  So
02:29   15  the line of authority that counsel is trying to tap into
02:29   16  just does not apply here.  We're not dealing with a shall
02:29   17  assign provision.  We're talking about contract language
02:29   18  that describes what will happen to the subject matter.  It's
02:29   19  not a promise by the contracting party to do something in
02:29   20  the future.
02:29   21         In terms of being specific, if -- this is a very
02:29   22  broad provision.  Basically it says anything the contractor
02:29   23  does is going to become Sofketeers' property.  You don't
02:29   24  have to go -- when you have broad language, there is no
02:29   25  requirement that you enumerate each and everything that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:29   1    falls under the broad language.  That's just silly.

02:29   2            So in terms of the arguments -- "work for hire,"

02:29   3    the presence of that phrase doesn't really matter here.  It

02:29   4    doesn't need to use the word "assign."  There is no

02:30   5    authority supporting that.  Tense doesn't matter here

02:30   6    because it's not describing a future obligation of the

02:30   7    contractor.  And it doesn't need to enumerate everything

02:30   8    that falls under the general description in order to be

02:30   9    sufficiently specific.

02:30   10           Anything on that, Your Honor?

02:30   11           THE COURT:  No.

02:30   12           MR. SEARS:  In terms of the implied license, the

02:30   13   Court was careful in its ruling to say that the injunction

02:30   14   covers the source code.  Now, there will be a closer

02:30   15   question in terms of the term of any license for the

02:30   16   executable code when we get to that in this case.  We're not

02:30   17   there yet.  Right now we are talking about source code.

02:30   18           Again, the most salient data point here is 18

02:30   19   years of uninterrupted course of performance by the parties

02:31   20   where Sofketeers retains full and exclusive possession of

02:31   21   the source code.  There is no way you can transform that

02:31   22   into an implied license that let's Regal do anything with

02:31   23   the source code.

02:31   24           In terms of remedy for harm, counsel brought up --

02:31   25   again rehashed the argument from the opposition that a

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:31   1   preliminary injunction would not remedy the harm.   In

02:31   2   particular, counsel focused on an argument that an

02:31   3   injunction would not necessarily force Regal to do business

02:31   4   with Sofketeers.

02:31   5           In the first place, that argument just underscores

02:31   6   the self-inflicted nature of whatever harm Regal might have.

02:31   7   It also overlooks the fact that there is a ready pool of

02:31   8   customers for Sofketeers' software and services.   If Regal

02:32   9   won't hire Sofketeers, Regal's customers will.

02:32   10          THE COURT:   Say that again, please.

02:32   11          MR. SEARS:   If Regal will not hire Sofketeers to

02:32   12   do whatever upkeep is necessary to continue serving Regal's

02:32   13   customers, Regal's customers will hire Softketeers.   That

02:32   14   puts this case in line with a long string of authority that

02:32   15   says if you are inflicting harm on someone by unlawful

02:32   16   conduct that deprives that person of income generated from

02:32   17   customer relationships, you stop the unlawful behavior, and

02:32   18   you allow the wronged party to profit from those

02:32   19   relationships.

02:32   20          That's exactly what we have got here.   Whether or

02:32   21   not Regal is going to play ball is beside the point.   If

02:32   22   Regal plays ball, great.   If Regal doesn't play ball,

02:32   23   Sofketeers can go to Regal's customers and --

02:32   24          THE COURT:   Or the other way around.

02:33   25          MR. SEARS:   Excuse me.   Yes, in all likelihood,

02:33   1   that's what we are going to see.

02:33   2          The Court also had some colloquy -- there was some

02:33   3   colloquy relating to the dilution of interest in the

02:33   4   software.  I don't think we heard anything persuasive on

02:33   5   that.  Just, oh, it's really to unwind those bits.  Not at

02:33   6   all.  There is a substantial similarity inquiry.  There are

02:33   7   all sort of things that would make --

02:33   8          THE COURT:  Don't most software businesses keep a

02:33   9   very tight control system such that you can go back on any

02:33   10  given date and see what the operative set of code was for

02:33   11  the operating system?  I don't think the record tells me

02:33   12  that, but from my own experience, I know that that's the way

02:33   13  businesses operate.

02:33   14         MR. SEARS:  In my experience, that is a typical

02:33   15  course for larger software companies as well.  I do not want

02:34   16  to leave the Court with that impression because I have not

02:34   17  verified that that is in fact Sofketeers's practice.  I know

02:34   18  that the allegation that Sofketeers cannot put together a --

02:34   19  as of February 1, 2019, the date of termination -- the idea

02:34   20  that Sofketeers cannot put together what the source code was

02:34   21  as of that date is incorrect.  In terms of Softketeers'

02:34   22  ability to recreate a historical version, I'm not prepared

02:34   23  to make a representation to the Court on that.

02:34   24         Coming to the issue of bond, again, this was

02:34   25  something that could have been raised in the opposition.  It

02:34    1    was not.  That said, if Regal thinks that something needs to

02:34    2    be said on the issue of bond, we would not -- and the Court

02:34    3    considers it appropriate -- we would not be opposed to

02:34    4    having some sort of further proceedings relating to setting

02:35    5    up a bond, but we do not think that should delay entry of

02:35    6    the order.

02:35    7              In terms of alleged vagueness in the order, the

02:35    8    only thing that counsel really pointed out is that there is

02:35    9    some source code that's not the subject yet of copyright

02:35    10   registrations.  What counsel overlooked is that all the

02:35    11   source code -- excuse me.  Source code can basically be

02:35    12   divided into three buckets.

02:35    13             There's the source code that is publicly

02:35    14   accessible, the ASPX source code and whatnot for the

02:35    15   website.  That's the subject of a registered copyright, and

02:36    16   we have not claimed trade secret protection for that.  There

02:36    17   is another body of software that is the subject of pending

02:36    18   applications for copyright registration.  That source code

02:36    19   is not public, so that source code is still protected as

02:36    20   trade secret.  Then, of course, there's the vast majority of

02:36    21   the software we are talking about that is covered both by

02:36    22   trade secret and by copyright.  So, no, it would not be

02:36    23   appropriate to carve out software for which copyright

02:36    24   registrations have not yet issued.

02:36    25             Unless the Court has other questions, I would like

02:36   1    to close with two notes on the tentative.  I mention these
02:36   2    because counsel mentioned that there was a second lawsuit
02:36   3    commenced in the Western District of Washington.  We were
02:36   4    served with that Friday afternoon after the Court's
02:36   5    tentative ruling was posted.  It includes some other things
02:37   6    that counsel alluded to as well, but it starts out with
02:37   7    several claims that are frankly compulsory counterclaims in
02:37   8    this case, so it appears that Regal is trying to escape this
02:37   9    Court's jurisdiction.
02:37   10        THE COURT:  But I have a feeling they would be
02:37   11   confronted with that argument in a motion.
02:37   12        MR. SEARS:  They will indeed.  Anyway, I mention
02:37   13   that just to say that it's not clear that even if the Court
02:37   14   enters the injunction that Regal is going to play along.  I
02:37   15   would not be surprised to see an appeal taken.
02:37   16        With that in mind, I think there are two respects
02:37   17   in which an otherwise excellent tentative might be made even
02:37   18   better before adoption is final.  One of those is on the top
02:37   19   of page 16.  I think there is just a clerical error.  The
02:37   20   word "Sofketeers" is used in place of "Regal" on the first
02:37   21   line of that.
02:37   22        Then the other which may be more important is on
02:37   23   page 4 where the legal standard is set out.
02:38   24        THE COURT:  On the first point, the first
02:38   25   "Sofketeers" in the second line, is that where you are?

27

| | | |
|---|---|---|
| 02:38 | 1 | MR. SEARS:  It's page 16, the first line of the |
| 02:38 | 2 | text. |
| 02:38 | 3 | THE COURT:  "A preliminary injunction" -- |
| 02:38 | 4 | MR. SEARS:  I wonder if my pagination came out |
| 02:38 | 5 | differently than yours. |
| 02:38 | 6 | THE COURT:  It may well have.  That page begins |
| 02:38 | 7 | with a full paragraph that starts, "A preliminary injunction |
| 02:38 | 8 | is also" -- |
| 02:38 | 9 | MR. SEARS:  Let's go to the end of that paragraph |
| 02:38 | 10 | and count up seven lines to the line that begins, "By Regal |
| 02:38 | 11 | West's's customers."  It's right before a citation to the |
| 02:39 | 12 | Nguyen declaration in Paragraph 27. |
| 02:39 | 13 | THE COURT:  "On the other hand, absent an |
| 02:39 | 14 | injunction" -- |
| 02:39 | 15 | MR. SEARS:  Yes. |
| 02:39 | 16 | THE COURT:  You're saying that should be "Regal"? |
| 02:39 | 17 | MR. SEARS:  No, sorry.  That first "Sofketeers" is |
| 02:39 | 18 | correct.  What I would suggest is that that sentence reads: |
| 02:39 | 19 | "On the other hand, absent an injunction, Sofketeers will |
| 02:39 | 20 | not be hired to do that work by Regal because of their |
| 02:39 | 21 | continued infringement nor by Regal's customers because -- |
| 02:39 | 22 | "Regal" instead of Sofketeers" right there -- "Regal is |
| 02:39 | 23 | providing those services directly at no additional cost." |
| 02:39 | 24 | THE COURT:  Okay. |
| 02:39 | 25 | MR. SEARS:  Then on what I have as page 4, which |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:39   1   is the Legal Standard Section, the last paragraph cites to

02:40   2   some pre-Winter language regarding the standard for a

02:40   3   preliminary injunction.  That paragraph so far as I can tell

02:40   4   reading through the tentative doesn't really do any work.

02:40   5   It just seems to me to invite if there is an appeal argument

02:40   6   about it.  In my mind, it could be removed.

02:40   7          THE COURT:  Well, Alliance for Rockies makes the

02:40   8   point.

02:40   9          MR. SEARS:  Correct.

02:40   10          THE COURT:  Okay.

02:40   11          MR. SEARS:  I would be happy to respond to

02:40   12   anything else, Your Honor.

02:40   13          THE COURT:  No.  Thank you.

02:40   14          MR. SCHOENHARD:  Briefly, Your Honor.

02:40   15          THE COURT:  Mr. Schoenhard, briefly.

02:40   16          MR. SCHOENHARD:  Just a few direct responsive

02:41   17   points, Your Honor.  First, Mr. Sears referred at the outset

02:41   18   to various arguments or evidence that in his view were not

02:41   19   presented in the briefing.  Respectfully, Your Honor, we had

02:41   20   moved to strike on an ex parte basis or seek a surreply in a

02:41   21   rather voluminous second declaration we got from Nguyen that

02:41   22   also carried with it a large volume of evidence that we have

02:41   23   had to this point no opportunity to directly address.  That

02:41   24   of course is of concern to us as is our inability to

02:41   25   cross-examine Mr. Nguyen as to various statements that we

02:41  1   believe to be false in his declarations.  I have not been

02:41  2   intentional in going outside the briefing, but I do think it

02:41  3   is necessary to provide Your Honor with the full context of

02:41  4   this matter.

02:41  5        Mr. Sears referred to what he called Regal's

02:41  6   effort to buy source code and establish joint ownership.

02:42  7   This is an item that appears on a couple of occasions in the

02:42  8   Court's tentative order.  Respectfully, I believe this is

02:42  9   very easily overstated.  It is not uncommon where parties

02:42  10  are working without any written agreement if there comes a

02:42  11  point where there is a rather large business transaction on

02:42  12  the rise there becomes a need for them to formalize the

02:42  13  relationship and part ways.

02:42  14        There is no reason to believe based on the record

02:42  15  as we have it that the offers that had previously been made

02:42  16  by Regal were attempts to buy source code as much as to

02:42  17  quiet title in what otherwise has been a complex scenario

02:42  18  over a lengthy period of time.

02:42  19        THE COURT:  Pretty hefty price tag to quiet title.

02:42  20        MR. SCHOENHARD:  Not particularly in this case,

02:42  21  Your Honor.  As I understand it, Regal has been paying

02:42  22  Mr. Nguyen on the order of or in excess of a million dollars

02:42  23  a year for the last 18 or 19 years.

02:43  24        The next item, Your Honor -- Mr. Sears gave you a

02:43  25  brief colloquy on what standard license software terms might

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:43    1    be.  I do think it's important to stress that there is a
02:43    2    significant difference between the world of custom software
02:43    3    that is built specifically for one customer for one
02:43    4    application where an implied license that is irrevocable is
02:43    5    generally applied and software that is intended for broad
02:43    6    market use where the assumption is the licensee of that
02:43    7    software is only acquiring that software for a limited
02:43    8    license term.  On that, I point Your Honor, for example, to
02:43    9    the Ninth Circuit's decision in Asset Marketing, which
02:43   10    relates to an implied license based on custom-made software.
02:43   11            Next, Mr. Sears referred to what he called a new
02:43   12    argument regarding the contractual language and claimed that
02:44   13    was not in our briefs.  I direct Your Honor's attention to
02:44   14    our opposition brief at page ten where we lay out exactly
02:44   15    that argument.  On this point, though, Mr. Sears
02:44   16    specifically refers to the "work for hire" language and says
02:44   17    that language does no work.  It's my understanding of the
02:44   18    contract interpretation that all terms of the contract are
02:44   19    generally presumed to do some work and should not be
02:44   20    considered just superfluous in order to get a desired
02:44   21    result.
02:44   22            THE COURT:  Does the inclusion of "work for hire"
02:44   23    negate the purport of the balance of the section?
02:44   24            MR. SCHOENHARD:  I believe that it was actually
02:44   25    intended to be a "work for hire" clause and to take the

02:44   1   benefit of the Copyright Act's work for hire provisions.

02:44   2        THE COURT:  So the fact that source code may not

02:44   3   be a subject of work for hire, does that render that clause

02:44   4   a nullity and that it conveys nothing?

02:44   5        MR. SCHOENHARD:  Correct, as to copyrights.  It

02:44   6   may well have some function in some other area, but as to

02:45   7   copyrights, I believe it creates it as a nullity.  Although

02:45   8   actually, Your Honor, to be clear, to the extent that the

02:45   9   programmers may have done other work for Sofketeers, to the

02:45  10   extent that work might have included user guides for some

02:45  11   various customers -- I don't know.  I am speculating now --

02:45  12   it does not mean it does no work or is a true nullity.  It

02:45  13   is a nullity as to source code.

02:45  14        Mr. Sears also referred to the "shall become"

02:45  15   language and at one point actually said "shall become" upon

02:45  16   creation.  I do want to be clear that the language "upon

02:45  17   creation" does not exist in that clause.  In fact, that is

02:45  18   precisely the problem with future tense language in

02:45  19   contractual provisions, that when you use the future tense,

02:45  20   the question remains when?  At what point shall it become?

02:45  21        THE COURT:  Why is that so?  You contract with me

02:45  22   to design software for a five-year period, and I want every

02:46  23   bit of that software to be mine.  On day one, you probably

02:46  24   haven't created any.  You might on day two, day 365, a year,

02:46  25   365.  Why can't a provision be drafted to cover all of that

| | | |
|---|---|---|
| 02:46 | 1 | even though some of the intellectual property may come into |
| 02:46 | 2 | existence down the line? |
| 02:46 | 3 | MR. SCHOENHARD:  It certainly can as a general |
| 02:46 | 4 | matter and it frequently does.  Most contract drafters have |
| 02:46 | 5 | learned to avoid future language or to specify time periods |
| 02:46 | 6 | and will, for example, say "shall be and hereby does become" |
| 02:46 | 7 | in the present tense.  Whether now or after created, it |
| 02:46 | 8 | becomes immediately the property of.  But it's "and hereby |
| 02:46 | 9 | does become."  That present tense is what does it. |
| 02:46 | 10 | THE COURT:  Well, wouldn't you back into the |
| 02:46 | 11 | argument all work created under this agreement is my |
| 02:46 | 12 | property?  Why don't you run into the argument and say, |
| 02:46 | 13 | well, it can't mean subsequent intellectual property created |
| 02:46 | 14 | because it says is? |
| 02:47 | 15 | MR. SCHOENHARD:  Well, that's also generally and |
| 02:47 | 16 | frequently dealt with in employment contracts as all |
| 02:47 | 17 | property now or herein after created is and shall be. |
| 02:47 | 18 | THE COURT:  Well, herein after created is in the |
| 02:47 | 19 | future isn't it? |
| 02:47 | 20 | MR. SCHOENHARD:  It is in the future, but if you |
| 02:47 | 21 | specify that is and shall be at the time that it comes into |
| 02:47 | 22 | being mine, that is a way to create a functionally living |
| 02:47 | 23 | contract.  But this actually creates the larger issue in |
| 02:47 | 24 | copyright law, which is a rather odd body of intellectual |
| 02:47 | 25 | property law when it comes to conveyance.  Copyright law is |

02:47  1  rather unique in requiring express writings in Section 204

02:47  2  so as to have conveyance.

02:47  3          Here I would again direct Your Honor to the Ninth

02:47  4  Circuit's decision in Effects as clarifying the need to in

02:47  5  fact have a proper writing so that you don't have

02:47  6  unintentional conveyance of things that were not yet known

02:47  7  that are accidentally captured within broad scope.

02:48  8          On the issue of irreparable harm, Mr. Sears refers

02:48  9  to Sofketeers' alleged ability to go out and take its

02:48  10  customers, other potential clients of Regal.  This, Your

02:48  11  Honor, tells me one of several things.  First, if this is in

02:48  12  fact true, then Sofketeers actually does have the

02:48  13  availability of an income stream and should not be now heard

02:48  14  to complain that it will be immediately rendered bankrupt.

02:48  15          Alternatively, what Sofketeers is suggesting is

02:48  16  that it is going to enter into a third-party logistics

02:48  17  business, something that I haven't seen any allegation on in

02:48  18  this case.  Regal is a logistics provider.  Its customers go

02:48  19  to Regal for logistics services.  Regal is not a provider

02:48  20  and purveyor of software to its customers.  It's a provider

02:48  21  of logistic solutions, and its customers go to it for

02:48  22  cross-docking, warehousing, and other logistics necessities.

02:48  23  I don't think there is any reason to suggest that Sofketeers

02:48  24  is in fact doing that.

02:49  25          As we pointed out in our opposition brief, the

02:49  1   case law is pretty clear that speculative ability to obtain

02:49  2   a customer is not sufficient to support a finding of

02:49  3   irreparable harm.  Sofketeers has not identified any

02:49  4   particular customer with which it would have business but

02:49  5   for entry of a preliminary injunction.

02:49  6          THE COURT:  I don't think that's the basis for

02:49  7   their claim of irreparable harm.

02:49  8          MR. SCHOENHARD:  I believe Mr. Sears suggested --

02:49  9          THE COURT:  No, he suggested that irreparable harm

02:49  10  to Regal's customers could be because those customers could

02:49  11  come to Sofketeers seeking very specific software creation

02:49  12  or modification services.  That was his point, that if I'm

02:49  13  looking at the totality of irreparable harm, don't look to

02:49  14  the third parties because Sofketeers is a solution for their

02:49  15  problem.

02:49  16         MR. SCHOENHARD:  If that was Mr. Sears' point,

02:49  17  maybe I misunderstood it.

02:50  18         THE COURT:  Am I correct?

02:50  19         MR. SEARS:  Yes, Your Honor.

02:50  20         MR. SCHOENHARD:  Then I would say on that point

02:50  21  that's simply ludicrous.  Softketeers is not in the business

02:50  22  of third-party logistics.  There is nothing in the record to

02:50  23  suggest they could provide warehousing and cross-docking to

02:50  24  Regal's customers.  So as to Regal's customers that could no

02:50  25  longer properly do business with Regal, I don't foresee how

02:50   1    Sofketeers is in any position to provide that service to

02:50   2    them.  They simply won't have anybody to deliver toys to the

02:50   3    children for Christmas.

02:50   4              THE COURT:  Is there a difference between

02:50   5    delivering toys and lines of code?

02:50   6              MR. SCHOENHARD:  There is a significant

02:50   7    difference.

02:50   8              THE COURT:  Yes.

02:50   9              MR. SCHOENHARD:  But Regal's customers don't need

02:50   10   the lines of code that operate Regal's computers for Regal

02:50   11   in order to provide warehousing and cross-docking services

02:50   12   to its customers.  So when those customers go into the

02:50   13   MyRegal portal, when those customers try to use the Regal

02:50   14   software so as to make sure that their products are shipped

02:50   15   and delivered properly, they are not going to Sofketeers.

02:51   16   They are not going to a software company.  They are going to

02:51   17   a logistics provider.  And if the logistics provider systems

02:51   18   aren't functional, that's when the toys aren't going to the

02:51   19   kids.

02:51   20              The final note I have is as to the scope of the

02:51   21   injunction Mr. Sears suggested that there was a trade secret

02:51   22   interest in as the yet unidentified source code that has not

02:51   23   yet been registered.  That source code has not been offered

02:51   24   to the Court here.  We have not had any opportunity to

02:51   25   review what source code this allegedly is.  In fact, I would

36

02:51   1   note that had we had the opportunity to cross-examine

02:51   2   Mr. Nguyen, we would have pointed out that among the

02:51   3   redactions in the source code that large portions appear

02:51   4   just to be redactions of the name Regal, the names of

02:51   5   various programmers, or comments in the code, not some

02:51   6   alleged trade secret of Sofketeers.

02:51   7            THE COURT:  Thank you.

02:51   8            I think I have Sofketeers's position.  The matter

02:52   9   will stand submitted.

02:52   10            MR. SEARS:  Thank, Your Honor.

02:52   11            THE COURT:  Do you want to suggest a nominal bond

02:52   12   amount?  I mean, I think a bond is appropriate here.  Absent

02:52   13   a fuller showing, do you want to suggest a nominal bond

02:52   14   amount?

02:52   15            MR. SEARS:  $5,000.

02:52   16            MR. SCHOENHARD:  Your Honor, a bond is of course

02:52   17   required to be considered by the Court --

02:52   18            THE COURT:  To be considered.

02:52   19            MR. SCHOENHARD:  Indeed.  And the burden in the

02:52   20   first instance is on the moving party to come forward and

02:52   21   present a showing to the Court as to what bond it is

02:52   22   prepared to offer in exchange for the preliminary

02:52   23   injunction.  Here we are happy to provide the Court with

02:52   24   evidence should the Court be seeking evidence as to the harm

02:52   25   that will befall Regal.  But as both parties have

02:52   1   acknowledged, Regal systems don't function without ongoing

02:52   2   maintenance.  A nominal bond does nothing to keep Regal in

02:52   3   business.

02:52   4           THE COURT:  Thank you.

02:52   5           MR. SEARS:  Thank you, Your Honor.

02:52   6           (Whereupon, the proceedings were concluded.)

02:52   7                       *     *     *

02:52   8

02:52   9

02:52   10

02:52   11

02:52   12

02:52   13

02:52   14

02:52   15

02:52   16

02:52   17

02:52   18

02:52   19

02:52   20

02:52   21

02:52   22

02:52   23

02:52   24

02:52   25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
02:52   1
02:52   2
02:52   3
02:52   4
02:52   5                        CERTIFICATE
02:52   6
02:52   7          I hereby certify that pursuant to Section 753,
02:52   8   Title 28, United States Code, the foregoing is a true and
02:52   9   correct transcript of the stenographically reported
02:52  10   proceedings held in the above-entitled matter and that the
02:52  11   transcript page format is in conformance with the
02:52  12   regulations of the Judicial Conference of the United States.
02:52  13
02:52  14   Date:  May 17, 2019
02:52  15
02:52  16
02:52                            /s/   Sharon A. Seffens  5/17/19
02:52  17                        _____
02:52                            SHARON A. SEFFENS, U.S. COURT REPORTER
02:52  18
       19
       20
       21
       22
       23
       24
       25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER