1   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
    PAUL M. SCHOENHARD (*Pro Hac Vice*)
2   paul.schoenhard@friedfrank.com
    NICOLE M. JANTZI (*Pro Hac Vice*)
3   nicole.jantzi@friedfrank.com
    801 17th Street NW
4   Washington, DC 20006
    Tel: 202-639-7254
5
6   HAWKINSON YANG LLP
    MATTHEW J. HAWKINSON (SBN 248216)
7   mhawkinson@hycounsel.com
    5670 Wilshire Boulevard, Suite 1800
8   Los Angeles, CA 90036
    Tel: 213-634-0369
9
10  Attorneys for Defendants Regal West Corporation
    d/b/a Regal Logistics, Vu Ho Inc., Thai Tran Inc.,
11  Rand Neeves, Vu Ho, Thai Quoc Tran,
    Trung Ngoc Doan, and Dong Bao Pham
12
13              UNITED STATES DISTRICT COURT
14              CENTRAL DISTRICT OF CALIFORNIA
15
16  SOFTKETEERS, INC.,                    CASE NO. 8:19-cv-00519-JWH (JDEx)

                Plaintiff,
17
        v.
18                                        **DEFENDANTS' NOTICE OF
    REGAL WEST CORPORATION                MOTION AND RENEWED
19  d/b/a REGAL LOGISTICS et al.,         MOTION FOR JUDGMENT AS A
                                          MATTER OF LAW OR, IN THE
20              Defendants.               ALTERNATIVE, A NEW TRIAL**

21
22  REGAL WEST CORPORATION
    d/b/a REGAL LOGISTICS, et al.,
23
                Counterclaimants,
24
        v.
25
    SOFTKETEERS, INC., et al.,
26
                Counterdefendants.
27
28

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on April 14, 2023 at 9:00 am, before the Honorable John W. Holcomb in Courtroom 9D of the Federal District Court for the Central District of California, located at 411 W. 4th Street, Santa Ana, California 92701-4516, Defendants Regal West Corporation d/b/a Regal Logistics, Vu Ho Inc., Thai Tran Inc., Rand Neeves, Vu Ho, Thai Quoc Tran, Trung Ngoc Doan, and Dong Bao Pham (collectively, "Defendants"), by and through their counsel of record, will and hereby renew their motion for judgment as a matter of law or, in the alternative, will move the Court for a new trial.

This Motion is made following the conference between counsel for Plaintiff and Defendants pursuant to Local Rule 7-3, which took place on March 7, 2023. Defendants understand that Plaintiff opposes.

This Motion is based upon this Notice; the accompanying Memorandum of Points and Authorities; and such further argument, evidence and authorities as may be presented at the hearing on this Motion.

DEFENDANTS' RENEWED MOT. FOR JMOL
OR A NEW TRIAL

Respectfully submitted,

Dated: March 17, 2023

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

By: */s/ Paul M. Schoenhard*

PAUL M. SCHOENHARD (*pro hac vice*)
paul.schoenhard@friedfrank.com
NICOLE M. JANTZI (*pro hac vice*)
nicole.jantzi@friedfrank.com
801 17th Street NW
Washington, DC 20006
Tel: 202-639-7254

HAWKINSON YANG LLP
MATTHEW J. HAWKINSON
mhawkinson@hycounsel.com
5670 Wilshire Boulevard, Suite 1800
Los Angeles, CA 90036
Tel: 213-634-0369

Attorneys for Defendants Regal West Corporation d/b/a Regal Logistics, Vu Ho Inc., Thai Tran Inc., Rand Neeves, Vu Ho, Thai Quoc Tran, Trung Ngoc Doan, and Dong Bao Pham

3

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1

II.    STATEMENT OF FACTS .............................................................................3

       A.    For 18 Years, All Agreed that Regal Owned the Software..................4

       B.    For 18 Years, the Software Was Tailored to Regal's Business ...........7

       C.    For 18 Years, the Developers Operated as Regal Employees .............9

III.   ARGUMENT.................................................................................................11

       A.    JMOL or, at Minimum, New Trial is Warranted Based on the Trial
             Record as to Infringement and Trade Secret Appropriation...............12

             1.    Regal Is the Work-for-Hire Owner of the Software....................13

             2.    Regal Is the Exclusive Owner as a Borrowing Employer...........28

             3.    Alternatively, Regal Is At Least a Co-Owner .............................29

       B.    Defendants are Entitled to Judgment as a Matter of Law Copyright
             Infringement and for Trade Secret Misappropriation Because
             Softketeers Abandoned Any Ownership Rights in the Software........31

       C.    Defendants are Entitled to Judgment as a Matter of Law Copyright
             Infringement and for Trade Secret Misappropriation Because Regal
             Has At Least an Implied License to Use, Retain, and Modify the
             Software.............................................................................................33

       D.    Defendants are Entitled to Judgment as a Matter of Law for Trade
             Secret Misappropriation Because Softketeers Failed to Establish
             that it Took Reasonable Measures to Maintain the Secrecy of the
             Source Code ......................................................................................38

       E.    Defendants are Entitled to Judgment as a Matter of Law of No
             Indirect Profits for Copyright Infringement and No Unjust Enrichment
             Claims for Trade Secret Misappropriation Because Softketeers Failed
             to Prove that These Damages Were Caused by Any
             Infringement/Misappropriation ..........................................................41

IV.    ADDITIONAL GROUNDS FOR A NEW TRIAL .......................................43

       A.    Neither the Court nor the Jury Has Made Findings of Fact or
             Conclusions of Law on the *Reid* Factors or Implied License .............43

       B.    The Trial Presentation Distracted from and Prejudiced Against the
             Central Issues of Ownership and License ...........................................45

1.      The Court Permitted the Jury to Receive Evidence and Argument
        Regarding Prior Settlement Offers ...............................................45

2.      The Court Permitted the Jury to Hear Biased Testimony About
        Purported Privileged Communications ........................................46

3.      The Court Presented the Jury with an Adverse Instruction as to
        the Replacement Software and Prevented Regal from Introducing
        Contrary Evidence .......................................................................47

4.      The Court Failed to Bifurcate Trial ............................................49

V.      CONCLUSION................................................................................50

2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aalmuhammed v. Lee*,
    202 F.3d 1227 (9th Cir. 2000) ............................................................30

*Arkeyo, LLC v. Cummins Allison Corp.*,
    342 F. Supp. 3d. 622 (E.D. Pa. 2017).........................................38, 39

*Asset Mktg. Sys. v. Gagnon*,
    542 F.3d 748 (9th Cir. 2008) ......................................................*passim*

*In re Citric Acid Litigation*,
    191 F.3d 1090 (9th Cir. 1999) ............................................................47

*Claiborne v. Blauser*,
    934 F.3d 885 (9th Cir. 2019) ......................................................12, 45

*Coach, Inc. v. Celco Customs Servs. Co.*,
    No. 11-CV-10787, 2014 WL 12573411 (C.D. Cal. June 5, 2014)....................13

*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989)......................................................................*passim*

*Complex Sys., Inc. v. ABN Ambro Bank N.V.*,
    2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013).......................................42

*Crowd Mgmt. Servs., Inc. v. U.S.*,
    1994 WL 481183 (9th Cir. Sept. 6, 1994) .........................................17

*Cruz v. Nat'l Steel and Shipbuilding Co.*,
    910 F.3d 1263 (9th Cir. 2018) ....................................................28, 29

*DaimlerChrysler Servs. v. Summit Nat.*,
    2006 WL 208787 (E.D. Mich. Jan. 26, 2006) ...................................42

*Estate of Diaz v. City of Anaheim*,
    840 F.3d 592 (9th Cir. 2016) ............................................................50

*ECIMOS, LLC v. Carrier Corp.*,
  2017 WL 10221053 (W.D. Tenn. Feb. 1, 2017) .................................................42

*Eisenberg v. Advance Relocation & Storage, Inc.*,
  237 F.3d 111 (2d Cir. 2000) ...............................................................................13

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,
  762 F.3d 829 (9th Cir. 2014) ..............................................................................11

*Fontana v. Harra*,
  2013 WL 990014 (C.D. Cal. Mar. 12, 2013).......................................................34

*Hadady Corp. v. Dean Witter Reynolds, Inc.*,
  739 F. Supp. 1392 (C.D. Cal. 1990) ...................................................................31

*I.A.E., Inc. v. Shaver*,
  74 F.3d 768 (7th Cir. 1996) ....................................................................9, 19, 41

*Idearc Media Corp. v. N.W. Directories, Inc.*,
  623 F. Supp. 2d 1223 (D. Or. 2008) ...........................................................18, 19

*Int'l Bus. Machines Corp. v. BGC Partners, Inc.*,
  2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013) ....................................................42

*Iskander v. Laugh Factory*,
  2020 WL 2114939 (C.D. Cal. 2020) ............................................................39, 40

*JBF Interlude 2009 Ltd. v. Quibi Holdings LLC*,
  2020 WL 9311954 (C.D. Cal. 2020) ...................................................................40

*JustMed, Inc. v. Byce*,
  600 F.3d 1118 (9th Cir. 2010) ....................................................................*passim*

*Lakeside-Scott v. Multnomah Cnty.*,
  556 F.3d 797 (9th Cir. 2009) ..............................................................................11

*Langfitt v. Fed. Marine Terminals, Inc.*,
  647 F.3d 1116 (11th Cir. 2011) ..........................................................................28

*Lopez v. Elec. Rebuilders, Inc.*,
  416 F. Supp. 1133 (C.D. Cal. 1976) ...................................................................31

MEM. OF POINTS AND AUTHORITIES
RE RENEWED MOT. FOR JMOL OR A NEW TRIAL

*Marya v. Warner/Chappell Music, Inc.*,
   131 F. Supp. 3d 975 (C.D. Cal. 2015) ................................................................31

*Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*,
   306 F.3d 806 (9th Cir. 2002) ............................................................................47

*Melchizedek v. Holt*,
   792 F. Supp. 2d 1042 (D. Ariz. 2011) ................................................................31

*Micro Star v. Formgen Inc.*,
   154 F.3d 1107 (9th Cir. 1998) ............................................................................31

*Mitchell v. 3PL Sys., Inc.*,
   No. 11-CV-534, 2012 WL 12886845 (C.D. Cal. Apr. 9, 2012) ..................16, 27

*Moffat v. Academy of Geriatric Physical Therapy*,
   2016 WL 7422259 (W.D. Wisc. Dec. 22, 2016) ................................................33

*Mojica v. Bos. Coll.*,
   2004 WL 5708263 (D. Mass. Jan. 9, 2004) ........................................................42

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ..............................................................................2

*Murphy v. City of Long Beach*,
   914 F.2d 183 (9th Cir. 1990) ............................................................................11

*Numbers Licensing, LLC v. bVisual USA, Inc.*,
   643 F. Supp. 2d 1245 (E.D. Wash. 2009) ....................................................35, 36

*Oddo v. Ries*,
   743 F.2d 630 (9th Cir. 1984) ........................................................................14, 31

*Oliver v. Johanson*,
   357 F. Supp. 3d 758 (W.D. Ark. 2018) ........................................................36, 37

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014) ......................................................................12, 43

*Parker v. Joe Lujan Enters., Inc.*,
   848 F.2d 118 (9th Cir. 1988) ............................................................................28

MEM. OF POINTS AND AUTHORITIES
RE RENEWED MOT. FOR JMOL OR A NEW TRIAL

*Polar Bear Prods., Inc. v. Timex Corp.*,
   384 F.3d 700 (9th Cir. 2004) ...............................................................41

*Pollara v. Radiant Logistics Inc.*,
   No. CV 12-344 GAF, 2014 WL 12585781 (C.D. Cal. June 6,
   2014) .......................................................................................................1

*Psihoyos v. Pearson Educ., Inc.*,
   855 F. Supp. 2d 103 (S.D.N.Y. 2012) ................................................37

*Pye v. Mitchell*,
   574 F.2d 476 (9th Cir. 1978) ..............................................................29

*Quest Integrity USA, LLC v. A.Hak Indus. Servs. US, LLC*,
   2016 WL 4533062 (W.D. Wash. 2016).............................................47

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*,
   531 F.3d 962 (9th Cir. 2008) ..............................................................30

*Richmond v. Weiner*,
   353 F.2d 41 (9th Cir. 1965) ..........................................................14, 28

*Rouse v. Walter & Assocs., L.L.C.*,
   513 F. Supp. 2d 1041 (S.D. Iowa 2007) ............................................33

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984)............................................................................38

*Ruiz v. Affinity Logistics Corp.*,
   754 F.3d 1093 (9th Cir. 2014) ............................................................21

*Science of Skincare, LLC v. Phytoceuticals, Inc.*,
   2009 WL 2050042 (C.D. Cal. July 7, 2009)......................................42

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) ............................................................49

*Seshadri v. Kasraian*,
   130 F.3d 798 (7th Cir. 1997) ..............................................................32

*Signorelli v. N. Coast Brewing Co.*,
   2019 WL 2569582 (N.D. Cal. June 21, 2019)...................................34

4

*Siniouguine v. Mediachase Ltd.*,
    No. 11-CV-6113, 2012 WL 2317364 (C.D. Cal. June 11, 2012).....16, 17, 20, 22

*Tan Lam v. City of Los Banos*,
    976 F.3d 986 (9th Cir. 2020) ....................................................................1

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
    692 F.3d 1009 (9th Cir. 2012) ................................................................12

*United States v. N.A. Degerstrom, Inc.*,
    408 F.2d (9th Cir. 1969) ........................................................................28

*VBS Distrib. v. Nutrivita Labs., Inc.*,
    811 F. App'x 1005 (9th Cir. 2020)...........................................................40

*White v. Kimmell*,
    193 F.2d 744 (9th Cir. 1952) ...................................................................31

*Yates v. Adams*,
    15-CV-4912, 2017 WL 783520 (N.D. Cal. March 1, 2017) ...........................37

**Statutes**

17 U.S.C. § 101 ...........................................................................................12

17 U.S.C. § 201 ......................................................................................12, 29

17 U.S.C. § 504(b) .......................................................................................41

18 U.S.C. § 1836(b)(3)(B)(II) .......................................................................41

18 U.S.C. § 1839(3)(A)..................................................................................38

Cal. Civ. Code § 3426.1(d)(2) .......................................................................38

Cal. Civ. Code § 3426.3(a) ...........................................................................41

**Other Authorities**

Restatement (Second) of Agency § 220 .....................................................23, 27

Fed. R. Civ. P. 50(b) ....................................................................................11

Fed. R. Civ. P. 59 ....................................................................................11, 42

MEM. OF POINTS AND AUTHORITIES
RE RENEWED MOT. FOR JMOL OR A NEW TRIAL

6 William F. Patry, *Patry on Copyright* § 22:131 (2010).........................................42

6

## I.      INTRODUCTION

For four years, Defendants have sought a declaration that Regal owns or at minimum has an irrevocable implied license to the software at issue in this case.  For the same four years, Softketeers has done everything possible to distract from these central issues with a constant barrage of motions, disputes and arguments unrelated to ownership or license.  And the result has been an extraordinary expenditure of private and judicial resources on what should have been—and what should still be— a straightforward case.  Worse, the result has been that justice has been delayed.  Regal was well within its rights to terminate its relationship with Mr. Nguyen and Softketeers.  Regal was and is well within its rights to retain, use and modify the software that it designed, developed and paid over $17 million for.

Justice demands that when the jury's determination is "against the great weight of the evidence," or when "it is quite clear that the jury has reached a seriously erroneous result," the Court must carefully review the record and then, after consideration, hold that a "mistake has been made."  *Pollara v. Radiant Logistics Inc.*, No. CV 12-344 GAF (JEMX), 2014 WL 12585781, at *9 (C.D. Cal. June 6, 2014).  Indeed, the Court has an obligation to "prevent a miscarriage of justice" even after the jury has returned a verdict.  *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1015 (9th Cir. 2020).  So here.

But likely swayed by little evidence and much innuendo regarding the testimony of Garry Neeves, a mysterious DHL package and Vietnam-based development of replacement software—none of which has any bearing at all on whether Regal owned or otherwise had rights to the software at issue in the first place—the jury returned a verdict in Softketeers's favor on the issues of copyright infringement and trade secret misappropriation.  It is, of course, human to be swayed by such things.  That is not the jury's fault.  But the jury's verdict is ultimately faulty.

In this case, a proper analysis of the work-for-hire *Reid* factors leads to only one conclusion:  ***Regal is the work-for-hire owner of the software at issue in this case***.  As detailed below, ***at least ten of the* Reid** *factors favor Regal; <u>none</u> clearly favors Softketeers*.  And where, as here, Regal owns the software at issue, no verdict of copyright infringement or trade secret misappropriation can stand.

Meanwhile, even if the Court determines that Regal is somehow not the work-for-hire owner of the software at issue, the jury's verdicts on liability still cannot stand. Regal W-2 employees contributed to the software (and ***Regal is thus at least a co-owner***); ***Softketeers abandoned any copyrights*** it had in the software; ***Regal has at least an irrevocable implied license*** to retain, use and modify the software; and ***Softketeers failed to take reasonable measures to maintain the secrecy*** of the source code.

To the extent the jury returned verdicts against Defendants on the issues of liability, the Court must recognize that such verdicts do not necessarily imply any factual findings on these central issues.[1]  To the contrary, the trial was dominated by—and at minimum a new trial is warranted because of—Softketeers's extensive presentation of prejudicial testimony and "evidence" that would tend to imply liability but that is ultimately irrelevant (or at best, minimally relevant) to any legal consideration of ownership or license.

Meanwhile, even if the jury's verdicts on liability are sustainable (they are not), the jury's damages verdicts are not.  On this issue, too, the law is quite clear: the Court must grant a new trial when "the damages are excessive." *Molski v. M.J.*

---

[1]    Defendants respectfully submit that the Court's determination that the verdict somehow implies findings on ownership and licensure is incorrect.  No such inference can be reasonably drawn in view of Final Jury Instruction No. 35, especially in view of the parties' agreement that work-for-hire ownership was an issue reserved for the Court, not the jury.

2

*Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (citation omitted).  Indeed, the jury's profit disgorgement awards are untethered to any evidence (there was none) that Regal's profits or Rand Neeves's salary were directly attributable to the software—any more so than they were attributable to electricity or Microsoft Office.

Defendants respectfully ask this Court to grant their renewed motion for judgment as a matter of law ("JMOL") or, in the alternative, for a new trial.

## II.  STATEMENT OF FACTS

Regal is a third-party logistics company.  Its primary responsibilities—and the primary bases for its revenues—are to unload (either manually or with the aid of forklifts) cargo containers of customer goods; to process those goods into inventory; to store those goods in Regal's warehouses; to pick requested quantities of goods in inventory for outbound shipment; and to load goods onto trailers for transit onward. Tr. (Nguyen) at 496:11–499:25; Tr. (Randy Neeves) at 1214:3–1221:4.

Since the 1980s, Regal's business has been supported by custom warehouse management system (WMS) software developed and maintained by a series of software developers and IT professionals working closely with Regal's management team.[2]  Tr. (Randy Neeves) at 742:25–743:2 ("[P]rior to 2001 . . . we ran two locations off of the System 36 and was the basis for the Regal WMS."), 1235:14–23; Dep. Tr. (Roque Neeves) at 11:4–15.  Until this lawsuit, there was never a question that Regal owned its WMS software.  Dep. Tr. (Roque Neeves) at 12:7–8; Tr. (Randy Neeves) at 742:23–743:2.

---

[2]      At trial, Mr. Nguyen initially claimed that he "d[id]n't know anything about System 36," Tr. (Nguyen) at 463:21–24, but he ultimately admitted that he communicated with Regal's System 36 developer, Rocky Phelps, Tr. (Nguyen) at 464:5–8, and even that he "would like to spend some time with [Garry] and Rocky, besides business talk, to go over all system components as detail as possible so we all have the same basis of understanding, that would make things easier going forward," JTX 81.

MEM. OF POINTS AND AUTHORITIES
RE RENEWED MOT. FOR JMOL OR A NEW TRIAL

In the late 1990s, Regal decided to update its proprietary WMS software to a Windows-based platform.  Tr. (Randy Neeves) at 1223:15–18; Dep. Tr. (Roque Neeves) at 13:8–23.  Initially, Regal hired a company called ALIS-USA to perform this work.  Tr. (Randy Neeves) at 1242:12–1243:6.

When that relationship broke down, Regal continued working with a subcontractor of ALIS-USA—Minh Nguyen.  Tr. (Nguyen) at 679:21–25.  Mr. Nguyen was going to create a "system to run [Regal's] business on."  JTX 245; Tr. (Nguyen) at 551:1–18.  The parties shook hands, and Mr. Nguyen got to work.

**A.   For 18 Years, All Agreed that Regal Owned the Software**

For the duration of the parties' relationship, Softketeers represented—and everyone involved understood—that Regal owned its software.  Both the founder of Regal—Roque Neeves—and its current CEO—Randy Neeves—testified that *ownership was never in dispute*:

> Q.   . . . Was there ever a point in time when you believed that Mr. Nguyen or Softketeers owned the software that Regal was using?
>
> A.   No, we never agreed to that.

Dep. Tr. (Roque Neeves) at 55:23–56:1.

> Q.   What was your personal understanding of who owned the software at issue in this case?
>
> A.   It was never in dispute. It was always joint ownership.

Tr. (Randy Neeves) at 1264:1–4.

Indeed, Roque Neeves testified that ***Regal never would have hired Mr. Nguyen*** if Mr. Nguyen had claimed any ownership rights himself:

> Q.   Did Mr. Nguyen tell you that he wanted to own the software he was working to develop?
>
> A.   ***No. No. I would never use him***.
>
> ...

4

> Q.   If Mr. Nguyen were to have told you that he believed he would own the software, would you have hired him?
>
> A.   In the beginning?
>
> Q.   Yes.
>
> A.   ***No, we never agreed to that.***

Dep. Tr. (Roque Neeves) at 17:3–5, 56:2–13. Mr. Nguyen did not even raise the issue of ownership or intellectual property rights when the parties formed their original arrangement. Dep. Tr. (Roque Neeves) at 16:17–24; Tr. (Ho) at 1299:6–21. It was not until after Regal terminated Softketeers that Mr. Nguyen sought copyright—or any intellectual property—protection in the software, Tr. (Nguyen) at 490:17–20, 493:11–18, nor did he ever tell Regal during the course of their relationship that he intended to seek copyright registrations in the software.  Tr. (Nguyen) at 493:3–10.

Much to the contrary, Mr. Nguyen and Softketeers's team of developers inserted copyright notices into the software ***identifying <u>Regal</u> as the copyright owner***.  JTX 213; JTX 1699; Tr. (Nguyen) at 564:20–565:9, 567:6–20; JTX 1701; Tr. (Ho) at 1376:19–1377:20.



Softketeers also represented on Regal's website, which Softketeers was responsible for building and maintaining, that the Warehouse Management System ("WMS") program belonged to Regal:

5

Q.     If we look a little higher on the page, there is a discussion of what is referred to as **Regal's WMS**.  Do you see that?

A.     Yes.

Q.     A member of your team posted this page to Regal's website; correct?

A.     That's correct.

Q.     And **you had no objection to Regal stating to the world that the WMS was Regal's WMS**; correct?

A.     They're using it.  So they can say it.

Tr. (Nguyen) at 575:25–577:8; JTX 1809.  And Softketeers identified the customer-facing WMS user interface as "MyRegal." JTX 734.

Indeed, Mr. Nguyen admitted that he had no evidence that any of the software programs displayed a notice of copyright identifying anyone other than Regal, including Softketeers, as the copyright owner.  Tr. (Nguyen) at 495:5–9.

Softketeers also, through its conduct, manifested a clear understanding and intent that Regal owned the software.  For example, Softketeers never obfuscated the code prior to delivering it to Regal, Tr. (Nguyen) at 398:12–13, confirming a belief that the code belonged to Regal:

Q.     And during your time working with Mr. Nguyen, did he ever ask you to obfuscate Regal's code?

A.     No. **I think it belong to Regal**, so why I need to encrypt it for.

Tr. (Doan) at 869:20–24;

Q.     And did Mr. Nguyen ever ask you to obfuscate the Regal code?

A.     No.

Q.     Do you know why?

[A.]   First, **I thought the code belong to Regal**.

Tr. (Tran) at 1078:13–16, 20–23.

**B.      For 18 Years, the Software Was Tailored to Regal's Business**

"Randy[ Neeves]'s involvement with Minh would be . . . sitting down with the team on a whiteboard and sketching out the functionality of what a particular module should look like and go through probably the terminology of the business." Dep. Tr. (Garry Neeves) at 53:15–19.   Randy Neeves also routinely provided Softketeers with written specifications for the software.   JTX 235; Tr. (Nguyen) at 467:22–468:2.     Indeed, ***Mr. Nguyen admitted that Regal personnel provided requirements for each of the software programs***:

> Q.      Now, a moment ago I asked you about Mr. Randy Neeves. You would agree that you consulted directly with Randy Neeves and others at Regal about what the software needed to do; is that correct?
>
> A.      Yes.

Tr. (Nguyen) at 469:14–470:20 ("***Regal personnel provided requirements***"; "***Regal personnel specified the requirements***").

Regal W-2 employees not only provided detailed requirements for the projects, they also directly assigned discrete tasks and supervised Softketeers's daily work. *E.g.,* Tr. (Randy Neeves) at 1265:7–1269:7; JTX 2181.091 at SOFT128338; *see also* JTX 2181 *passim.* The other developers confirmed that they received, and followed, instructions directly from Randy Neeves and other Regal employees on a daily basis:

> Q.      So what were you doing on a daily basis when you did work with Mr. Nguyen?
>
> A.      I developed -- I working on the WMS with the Warehouse Management System. I developed and fix the bug and do the Regal customer support and the IT and ***handle all the work Regal asked me to do and take the direction from Regal and Mr. Randy Neeves,*** if any need of the software needs to be done, that's my daily basis.
>
> Q.      So whatever Randy needed to be done, you would do for Regal?

7

A.    Yes.

Q.    Okay. And you mentioned bugs. How did you know what bugs to fix in the Regal code?

A.    The bug came in from the -- the group of the WMS support from Regal, and I'm the one -- one of them who received the e-mail directly from that group. So when the bug come in from the Regal management team of Regal operation or Regal customer, then it come over to my mailbox. And from there I -- I go into the bug, and I do the bug fix, if necessary.

…

Q.    And when you were working with Regal, how did you know what new features to develop for the software?

A.    ***First, I check the direction from Mr. Randy Neeves.*** He either call me directly or e-mail me. ***And there is some direction from the Regal management team,*** and they send over to the WMS support e-mail. That's when I got the direction to working on it.

Tr. (Tran) at 1074:13–1075:6, 1075:21–1076:2; Tr. (Ho) at 1303:7–25.

Regal's constant input was required to develop the software, as it was ***Regal's "business processes [that] were dictating [] the program."*** Dep. Tr. (Garry Neeves) at 47:7–8; Tr. (Nguyen) at 396:13–14 ("[T]he software will follow the business wherever the business goes."). ***As Mr. Nguyen admitted, the software was developed custom for Regal, tailored to Regal's requirements, and included Regal's customer information***:

Q.    Okay. Mr. Nguyen, you would agree that each of the software programs at issue in this case was specifically ***custom made for Regal***; correct?

A.    That's correct.

…

Q.    The WMS ***included Regal's customer names*** hard-coded into the code; correct?

A.    That's correct.

…

8

Q.   And the WMS included hard-coded into it *information regarding Regal's customers* that required special handling; correct?

A.   That's correct.

…

Q.   And there was information hard-coded into the software regarding *how Regal billed customers*; correct?

A.   That's correct.

Tr. (Nguyen) at 460:12–15, 462:25–463:2, 463:17–20, 496:20–22. *See also* JTX 2175-2 (reflecting Regal customer names and Regal-assigned customer codes in the source code for the software).

Additionally, for Softketeers to provide the requested services, Regal "provided servers, firewalls, printers, also MSDN licensing for software programming tools. A number of different things that related to [Regal's] business." Tr. (Randy Neeves) at 1270:4–8; *see also* Tr. (Nguyen) at 486:19–21 ("Q. And anything that was related to Regal's use, they paid for; correct? A. Yes."), 686:16–687:3; JTX 2181.

## C.   For 18 Years, the Developers Operated as Regal Employees

Mr. Nguyen, though not a Regal W-2 employee, was treated like, and identified himself as, a Regal employee. For example, when communicating with Regal's customers, Mr. Nguyen said, "*This is Minh __from Regal__*," JTX 222, and "*I work for Regal West Corp in Fife, WA*," JTX 223. And it was Regal, and not Mr. Nguyen, who prescribed the contours of the work to be performed. Indeed, when Mr. Nguyen first started working for Regal, the only project he was assigned was to convert Regal's existing warehouse management software to a Windows-based platform—*i.e.,* the parties did not initially discuss building any other software programs. Tr. (Nguyen) at 554:7–23. Mr. Nguyen performed the work requested of him, by Regal, at his agreed-upon hourly rate. Tr. (Nguyen) at 554:24–555:11.

9

The other developers were similarly treated as Regal employees. For example, Regal drafted job postings for open developer positions, which it would task Mr. Nguyen with publishing. Tr. (Nguyen) at 480:5–9 ("Q. … Randy Neeves worked with you, Minh Nguyen, to post job postings on monster.com for software engineers; correct? A. That's correct."). One such job posting stated that "***Regal Logistics . . .*** is seeking an experienced Software Engineer/Developer in ***Fife, WA or Westminster, CA."*** JTX 739. Indeed, Mr. Nguyen admitted that at least one developer, Tony Vu, was hired "in response to the ad posted by Regal specifically to work for Regal." Tr. (Nguyen) at 473:24–474:3, 478:6–8.

Additionally, the developers, including Mr. Nguyen, often worked on-site at Regal:

> Q.    In the first few years of the relationship, ***you worked physically on site at Regal at least one week every month***; correct?
>
> A.    Um, the -- when we deploy the first WMS, ***yes***.
>
> …
>
> Q.    And if we look throughout the invoices you provided Regal, anytime we see the reference to "on site," that means ***you were physically on site at Regal***; correct?
>
> A.    ***That's correct***.

Tr. (Nguyen) at 480:10–17, 485:8–17; Tr. (Tran) at 1075:7–13 ("Yes. A lot."; "***one week per month***"); Tr. (Ho) at 1077:7–18 ("[David Pang] come over there and working ***full-time on site***"); *see also* Tr. (Ho) at 1301:5–18.

Finally, Regal paid the developers on an hourly basis for their development work performed on each of the software programs, Tr. (Nguyen) at 471:7–12, 471:21–472:15, "development work performed on Regal's marketing website," *id.* at 472:16–18, "work interfacing with customers," *id.* at 472:24–473:1, and "work performed responding to customer service inquiries," *id.* at 473:2–4. *See generally id.* at 473:5–11. And such payment was contingent on Regal's approval of the work

performed. *Id.* at 473:12–14 ("Q. The developers knew that *if Regal didn't approve of their work, they wouldn't get paid*; right? A. That's the understanding.").

By the time Regal terminated its relationship with Softketeers in February 2019, it had paid Softketeers over $17 million. Tr. (Cragun) at 1154:8–14. To be clear, however, at no point did Regal pay a license fee for the software at issue in this case. Tr. (Nguyen) at 553:11–13. Nor did Mr. Nguyen ever ask for one. *Id.* The reason was always well-known: Regal was paying Softketeers not for software or a software license, but for IT *services*, including software development, website development, server maintenance, and customer service. Tr. (Nguyen) at 575:6–9; 579:11–14. *Regal was not buying or licensing <u>Softketeers's</u> software; Regal had hired Softketeers to work on <u>Regal's</u> software*.

## III.   ARGUMENT

JMOL under Rule 50(b) is appropriate where "the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009) (quotation omitted). While the Court "view[s] the evidence in the light most favorable to the party in whose favor the jury returned a verdict and draw[s] all reasonable inferences in [its] favor," "a reasonable inference" must be "supported by . . . significant probative evidence." *Id.*

In contrast, when considering a motion for new trial under Rule 59, the Court "is not required to view the trial evidence in the light most favorable to the verdict" and "can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014); *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (the judge "ha[s] the right, and indeed the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his

11

conscientious opinion, the verdict is contrary to the clear weight of the evidence"). Specifically, the Court should order a new trial "where 'the verdict is against the weight of the evidence,' 'the damages are excessive' or, 'for other reasons, the trial was not fair to the moving party.'" *Claiborne v. Blauser*, 934 F.3d 885, 894 (9th Cir. 2019) (citation omitted). Where a damages verdict is excessive, the Court may grant a new trial unless the plaintiff accepts a remittitur reflecting "the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014). Applying these standards, the judgment should be set aside.

### A.    JMOL or, at Minimum, New Trial is Warranted Based on the Trial Record as to Infringement and Trade Secret Appropriation

No reasonable jury could find—and it would be a miscarriage of justice to conclude—that Defendants are liable for copyright infringement or trade secret misappropriation because ***Regal owns the software at issue***. "Copyright in a work . . . vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Though authorship generally vests initially with the creator, authorship may vest at the outset in a different individual or corporate entity where it is a "work made for hire." *See* 17 U.S.C. § 201(b); *see generally U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th Cir. 2012). The "work made for hire" doctrine applies to the contributions of employees to any copyrightable work so long as the work is "prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author . . . and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b). As demonstrated at trial, ***Regal owns the copyrighted works as a matter of law***.

And even if the Court finds that there is enough evidence for Softketeers to survive JMOL (there is not), a new trial is warranted because, once the force and

credibility of the evidence is considered, the jury verdict was clearly contrary to the weight of the evidence. *Coach, Inc. v. Celco Customs Servs. Co.*, No. 11-CV-10787, 2014 WL 12573411, at *14-16 (C.D. Cal. June 5, 2014) ("[N]ew trial . . . may be ordered by the district court if, in its opinion, the jury's verdict was clearly contrary to the weight of the evidence.").

### 1.     Regal Is the Work-for-Hire Owner of the Software

The trial record demonstrates that Regal is the exclusive owner of the software at issue because the software was created as a work made for hire on Regal's behalf. Thirteen factors, no one of which is conclusive on its own, are to be considered when determining whether Softketeers and the developers it worked with qualify as Regal employees for copyright purposes. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989).  Whether the software was created as work for hire is ultimately a question of law.  *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125 (9th Cir. 2010) ("We review de novo the district court's conclusions of law . . . including its determination that the source code was a work made for hire . . . ."); *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 115 (2d Cir. 2000) ("The District Court's determination as to 'the presence or absence' of each *Reid* factor is a finding of fact . . . .  The District Court's 'ultimate determination' as to whether a worker is am employee or an independent contractor—that is, the District Court's balancing of the *Reid* factors—is a question of law."); *see also* ECF No. 753 at 36.

Here, as discussed below, the *Reid* factors dictate that this Court conclude, as a matter of law, that the software was a work made for hire and that Regal is the sole owner of the software at issue.  Indeed, ***at least ten of the Reid factors weigh squarely in Regal's favor; none clearly favors a finding for Softketeers***.  This, of course, was not a jury issue.  At trial in this matter, Softketeers insisted that "Softketeers and Minh Nguyen do not consent pursuant to Rule 39(c)(2) to be bound

13

by the jury verdict on any issues not triable to the jury, such as . . . work for hire." Tr. at 1535:1–4.  But because Regal is the work for hire owner of the software at issue, the jury's verdicts on the issues of copyright infringement and trade secret misappropriation cannot stand.  *See Richmond v. Weiner*, 353 F.2d 41, 42 (9th Cir. 1965) ("[A] copyright owner cannot infringe against his own copyright."); *see also Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984) ("A co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright."); *Asset Mktg. Sys. v. Gagnon,* 542 F.3d 748, 752 (9th Cir. 2008) (holding that because alleged copyright infringer had an implied license to the copyrighted work, the "license included access to any trade secret embodied therein.").

## a.    Control over the way the work was accomplished

The evidence adduced at trial could not be clearer:  Regal had, and exercised, the right to control the manner and means by which the software at issue in this case was developed.  As Mr. Nguyen testified, "each of the software programs at issue in this case was specifically custom made for Regal," Tr. (Nguyen) at 460:12–15, and each was designed so that the software would "follow the business wherever the business goes." Tr. (Nguyen) at 396:7–8.  Garry Neeves confirmed that Regal's intention was specifically to have "custom software," created at Regal's direction, so that Regal's "business processes" dictated the operations and functionality the program. Dep. Tr. (Garry Neves) at 47:7–9.

As the Court is aware, the software at issue here was not "off the shelf" software developed by Softketeers and then sold to or modified for Regal.  Indeed, Mr. Nguyen had never previously written WMS software and needed Regal to explain it to him. Tr. (Nguyen) at 461:2–4.

The starting point was Regal's preexisting System 36 WMS, the system that was supporting Regal's business for almost 20 years before Mr. Nguyen and

14

Softketeers came into the picture. *See, e.g.*, Tr. (Nguyen) at 464:5–8 (Mr. Nguyen discussing System 36); JTX-81 (email regarding System 36).   And throughout, Regal tightly controlled the team's development and maintenance efforts.

*Regal provided detailed oral instruction*:  "Randy's involvement with Minh would be . . . sitting down with the team on a whiteboard and sketching out the functionality of what a particular module should look like." Dep. Tr. (Garry Neeves) at 53:15–19.

*Regal provided written specifications*. *E.g.*, JTX 235:

 

Tr. (Nguyen) at 467:22–468:2 ("Q. Mr. Nguyen, Exhibit 235 is a set of specifications that was provided to you by Regal; correct? A. This is the requirements. Q. You, in fact, received these requirements from Regal; correct? A. Yes.").

*Regal personnel provided requirements for each of the software programs*. Tr. (Nguyen) at 469:14–470:20.

*Regal personnel directed the day-to-day development work*.  JTX 21811.091 at SOFT128338 (timesheet descriptions reflecting specific programming tasks performed at the specific request of multiple identified Regal employees); Tr. (Randy Neeves) at 1265:13-20 ("Q. Did other Regal W-2 employees exercise direction and control over Mr. Nguyen or other members of the team? A: Sure. Worked with Vu, Charlie, Thai, Don. In the past couple years, not as much with Kevin because most of that would go through Thai or Vu. So, you know, as I—as

15

the business grew and I grew, in the later years I had to delegate. I couldn't do everything all at once."). ***Each of the four individual developers who appeared at trial, Vu Ho, Thai Tran, Trung Doan, and Kevin Pham, testified under oath that Regal directed and controlled their work***. Tr. (Tran) at 1074:13–23; Tr. (Ho) at 1303:7–25; Tr. (Doan) at 869:20–23. Each testified that he reported to Randy Neeves and that Randy Neeves gave them their assignments.[3]

As in *JustMed*, Regal's "[i]nput . . . regarding [the] computer program's functions 'weighs heavily in favor of finding [the] programmer[s] . . . employee[s]." *JustMed, Inc.* 600 F.3d at 1127 (quoting *Aymes v. Bonelli,* 980 F.2d 857, 862 (2d Cir. 1992)).  Indeed, this factor weighs even more heavily in Regal's favor here than in *JustMed* and other similar cases in which work-for-hire authorship was found.  In *JustMed*, for example, the company "did not exercise much control over the manner and means" by which the programmer created the source code, *id.* at 1127, whereas here, the record shows that Regal exercised significant direction and control.  In *Mitchell v. 3PL Sys., Inc.*, No. 11-CV-534, 2012 WL 12886845, at *1 (C.D. Cal. Apr. 9, 2012), the court held that the software at issue could be a work for hire based merely on a "showing that [the company] retained control over the software by meeting periodically with [the developer] to discuss the Software and overseeing its overall development." *Id.* at *6.  And in *Siniouguine v. Mediachase Ltd.,* No. 11-CV-6113, 2012 WL 2317364, at *6–7 (C.D. Cal. June 11, 2012), the court found that this factor favored a finding of work-for-hire, simply because defendant company's supervisors suggested improvements and required certain changes to the

---

[3]     The only exception to this was the testimony of Mr. Pham, who testified that most of the time he received his work assignments from Mr. Tran, who, in turn, had received them from Randy Neeves.  *See* Tr. (Pham) at 1105:22-25; Tr. (Tran) at 1074:13-23.  This is consistent with the truth that it was Regal who maintained and exercised the right to control the development of the software.

code that plaintiff software developer wrote. *Id.* at *7.

Even to the extent Softketeers argues that Mr. Nguyen provided *some* management oversight over the development process, the weight of this factor is heavily in Regal's favor. *Crowd Mgmt. Servs., Inc. v. U.S.,* 1994 WL 481183, at *2 (9th Cir. Sept. 6, 1994) ("The mere fact that [the hired party was] not told specifically what to do each minute they were at the job site does not demonstrate that the workers were independent contractors.").

### b.     The skill required to create the work

Although basic programming skills were required to create the software, the evidence at trial confirms that Regal provided Mr. Nguyen and the other developers with the specialized skills and knowledge required to develop and maintain Regal's custom software.

Mr. Nguyen testified that prior to working for Regal he had never created or written warehouse management software:

Q.     Before you started working for Regal, you had not made a Warehouse Management System program; correct?

A.     That is correct.

…

Q.     Had you already written a WMS program before you were hired by Regal?

A.     No.

Tr. (Nguyen) at 460:16-18, 461:2-4.  Indeed, Mr. Nguyen knew nothing about third-party logistics, about Regal's business or about the proprietary business processes and customer and financial information that was ultimately built into Regal's software. Dep. Tr. (Garry Neeves) at 53:15–19 (explaining that, among other things, Randy Neeves would explain to Mr. Nguyen "the terminology of the business"); Tr. (Nguyen) at 496:11–13 ("Q. During [your relationship with Regal], you got to know

17

Regal's business reasonably well; correct? A. That is correct."); Tr. (Ho) at 1301:12–1302:23 (confirming lack of pre-existing knowledge and efforts by Regal to educate).  And when "Regal needed [him] to be ready to work with RFID," "Regal paid for [him] to attend an RFID class."  Tr. (Nguyen) at 485:18–24.  Notably, Garry Neeves also confirmed this, testifying that Mr. Nguyen attended an RFID seminar at MIT as a representative of "Regal":

> Q.    Do you know whether Regal has ever paid for Mr. Nguyen to attend computer training classes?
>
> A.    Yes. Referring to the RFID. Minh attended a seminar at MIT. It was kind of funny because they had Fortune 500 companies at this seminar, and then you had Regal.

Dep. Tr. (Garry Neeves) at 171:1–6.

Accordingly, the evidence reflects that much of the skill needed for Softketeers to support the development and maintenance of the software at issue was actually provided by Regal.  *See Idearc Media Corp. v. N.W. Directories, Inc.,* 623 F. Supp. 2d 1223, 1229 (D. Or. 2008) (finding the hired party to be an employee of Defendant under the work-for-hire doctrine, in part, because she was trained by Defendant, despite the fact that she was paid by and received her employment benefits from a third party).

This, of course, is not surprising, as the evidence also reflects that Regal had a long history of hiring computer programmers to develop and maintain its custom warehouse management system software.  Dep. Tr. (Roque Neeves) at 10:25–11:22, 12:2–6 (describing System/36 and the role of Rocky Phelps); Tr. (Randy Neeves) at 1212:5 ("worked with our System 36 programmer"), 1235:14–1238:21; *see also* Tr. (Ho) at 1302:2–7 ("So I learned it from Rocky Phelps on the VB application, some on System 36, and some from Randy.").  Where a company like Regal's "regular business requires it to employ programmers," that "computer programming is a skilled profession" is "far from conclusive." *JustMed*, 600 F.3d at 1125–28.

This factor is thus neutral or weighs in favor of Regal.

### c.     The source of the instruments and tools

Regal provided the equipment and tools necessary for the developers to perform their work. For example, as Randy Neeves testified, Regal provided "servers, firewalls, printers, [and] MSDN licensing for software tools." Tr. (Randy Neeves) at 1270:4–8. Garry Neeves conceded that Regal may have supplied "laptops or other computer hardware," Dep. Tr. (Garry Neeves) at 170:23–25.   And ***Mr. Nguyen admitted that Regal provided "printer ribbon[s]," "software licenses," and indeed "anything that was related to Regal's use."***   Tr. (Nguyen) at 486:8–21, 686:13–687:3 (***Regal paid "all the peripheral expenses"***).

Regal also provided Softketeers with a starting point for the WMS software program, *i.e.,* Regal's System 36 WMS, Tr. (Randy Neeves) at 742:25–743:2 ("[P]rior to 2001 . . . we ran two locations off of the System 36 and was the basis for the Regal WMS."), for which Mr. Nguyen specifically requested "to go over all system components as detail as possible so we all have the same basis of understanding, that would make things easier going forward," JTX 81.  And Regal paid for Mr. Nguyen to attend a class to learn about RFID technology, essential knowledge to designing RF Systems. Tr. (Nguyen) at 485:18–24; Dep. Tr. (Garry Neeves) at 171:1–6; *see Idearc Media,* 623 F. Supp. 2d at 1229.

This factor strongly favors Regal.

### d.     The location of the work

When it comes to software development, courts have found "physical separation between the hiring party and the worker . . . less germane." *JustMed,* 600 F.3d at 1127–28 ("The nature of the business and the work similarly means . . . the fact that he worked from home [is] not particularly relevant. As a programmer, Byce could, in essence, ply his craft . . . from any place without

significant impairment to its quality or his ability to meet JustMed's needs.").

Even so, ***Mr. Nguyen "worked physically in Regal's facilities with some regularity***," particularly "[i]n the first few years of [the parties'] relationship." Tr. (Nguyen) at 480:10–17, 485:8–17.   Other developers also worked on-site at Regal with regularity throughout the parties' relationship.   For example, Mr. Tran testified that he worked on site at Regal "[a] lot," "one week per month." Tr. (Tran) at 1075:7–13, 1076:22–1077:18.   Mr. Ho's testimony was consistent. Tr. (Ho) at 1301:5–18.   And Softketeers's invoices make frequent reference to the developers' work "on site." *See* JTX-2181 *passim*; Tr. (Nguyen) at 485:8–17. Mr. Ho also recalled David Peng, a "full-time employee for Softketeers," working "full-time on site for Regal" "[w]hen Regal opened the facility in Anaheim." Tr. (Ho) at 1077:7–18.

This factor favors Regal.

### e.   The duration of the relationship

Softketeers and Regal had a longstanding relationship of nearly twenty years, which weighs heavily in favor of finding an employer-employee relationship. Tr. (Nguyen) at 496:8–10 ("Q. Mr. Nguyen, you worked with Regal for a period of nearly 20 years; correct? A. That is correct."); Tr. (Nguyen) at 319:24-320-3 (discussing that Mr. Nguyen and Regal worked together for 18 or 19 years); Tr. (Nguyen) at 342:14-19 (discussing that Mr. Nguyen and Regal worked together from 2000 through 2019; *see Siniouguine,* 2012 WL 2317364, at *6–7 ("[T]hat Siniouguine worked for Mediachase for twelve years weighs in favor of a finding that Siniouguine was an employee of Mediachase").

Further, the record demonstrates that there was no contemplated end to the relationship between Softketeers and Regal. *See* Tr. (Nguyen) at 437:7-12 (discussing that Softketeers continued to provide services right up until February 1,

20

2019); Tr. (Nguyen) at 441:5-6 (discussion that Regal terminated Softketeers abruptly); *Ruiz v. Affinity Logistics Corp.,* 754 F.3d 1093, 1105 (9th Cir. 2014) (concluding that the hired party was an employee, and not an independent contractor, because, *inter alia,* "there was no contemplated end to the service relationship").

This factor strongly favors Regal.

### f.    The right to assign additional projects

Regal undoubtedly had the right to assign additional projects to Softketeers. Indeed, when Mr. Nguyen first started working for Regal in 2000, the only project Regal assigned was the ongoing conversion project from System 36 to a Windows-based WMS program written in VB 6.0. Tr. (Nguyen) at 554:7–23 (confirming that none of the other software programs at issue were discussed when Regal first hired Mr. Nguyen). But over the course of 18 years, Regal requested, and Softketeers supported the development and maintenance of, a dozen additional software programs. *See* Tr. (Nguyen) at 471:21–472:15 (confirming that Regal paid for the requested development of additional software programs). Regal also requested, and Softketeers performed, "development work [] on Regal's marketing website," Tr. (Nguyen) at 472:16–18, "work interfacing with customers," Tr. (Nguyen) at 472:24–473:1, and "work [] responding to customer service inquiries," Tr. (Nguyen) at 473:2–4.  Additionally, as detailed above, multiple Regal W-2 employees assigned discrete tasks to individual developers on a daily basis.  Tr. (Randy Neeves) at 1265:7–1269:7; JTX 2181.0091. Various IT and customer support issues were communicated to Softketeers-related developers via the email address "WMSSupport@regallogistics.com." *E.g.*, Tr. (Nguyen) at 487:2–6; Tr. (Pham) at 1095:14–21; Tr. (Tran) at 1074:24–1075:6.  And Regal's customers called Thai Tran directly with customer support issues on a 24/7 basis. Tr. (Tran) at 1076:8–21.

This factor strongly favors Regal. *JustMed,* 600 F.3d at 1126 ("Byce did other

21

work for JustMed as well. He updated the company's Web site . . . his continued work on tasks besides programming indicates JustMed could have assigned additional projects to Byce."); *Siniouguine,* 2012 WL 2317364, at *7 ("[T]he fact that Siniouguine was not hired to work on a single program and, in fact, worked on multiple computer programs and other projects" including "handling customer support for Mediachase; . . . handling maintenance and upkeep of Mediachase's website; . . . coordinating with other programmers on projects and working on client-specific projects" "supports a finding that Siniouguine was an employee of Mediachase.").

### g.      Discretion over when and how long to work

Courts have explained that discretion over when and how long to work is not particularly relevant in the context of software development. *JustMed,* 600 F.3d at 1127–28 ("The nature of the business and the work similarly means that Byce's ability to set his own hours . . . [is] not particularly relevant. As a programmer, Byce could, in essence, ply his craft at any time . . . without significant impairment to its quality or his ability to meet JustMed's needs."). Nonetheless, here, while Regal did not completely dictate the developers' day-to-day schedules, Regal did set regular periods of time when developers were expected to be on-site at Regal. JTX 2181 (billing records showing on-site periods); Mr. Nguyen "worked physically in Regal's facilities with some regularity," Tr. (Nguyen) at 480:10–17, 485:8–17; and other developers also worked on-site at Regal with regularity throughout the parties' relationship. Tr. (Tran) at 1075:7–13, 1076:22–1077:18; *see also* JTX-2181 *passim;* Tr. (Nguyen) at 485:8–17.

And significantly, Regal assigned tasks for immediate performance on a day-to-day basis. *E.g.,* Tr. (Randy Neeves) at 1265:7–1269:7; JTX 2181.0091 (identifying work performed pursuant to requests by various Regal employees). In

22

fact, both Regal and its customers expected 24/7 access to certain developers. Tr. (Tran) at 1074:13–1075:6, 1075:21–1076:2, 1076:8–21; Tr. (Ho) at 1303:7–25.

This factor weighs strongly in favor of Regal.

### h.     The method of payment

Courts have routinely found that "independent contractors are often paid upon completion of a specific job." *JustMed, Inc.*, 600 F.3d at 1127; Restatement (Second) of Agency § 220 cmt. J (a worker is likely to be an independent contractor "if payment is to be made by the job and not by the hour"). By contrast, here, Regal paid Softketeers on an hourly, rather than per-project, basis for its software development and other IT services. As Mr. Nguyen testified, "***[e]very hour [he] or one of the members of [his] team worked would be invoiced to Regal and Regal would pay for it***," whether or not the project as a whole had been completed. Tr. (Nguyen) at 473:5–11. This is not a case in which software was made for a set fee, for payment upon delivery. *Instead*, the developers were hourly workers that, as Mr. Nguyen testified, were paid when *Regal* approved of their work. Tr. (Nguyen) at 473:12-14 ("Q. The developers knew that ***if Regal didn't approve of their work, they wouldn't get paid***; right? A. That's the understanding.).

This factor strongly favors Regal.

### i.     The worker's role in hiring and paying assistants

Softketeers provided some support in hiring the developers, but the parties routinely collaborated in drafting and publishing developer job postings, and in doing so identified ***Regal*** as the hiring party. Tr. (Nguyen) at 480:5–9 ("Q. … Randy Neeves worked with you, Minh Nguyen, to post job postings on monster.com for software engineers; correct? A. That's correct."); JTX 739 (job description reflecting "***Regal Logistics . . .*** is seeking an experienced Software Engineer/Developer in ***Fife, WA or Westminster, CA");*** JTX 1819. Mr. Nguyen admitted that at least one

MEM. OF POINTS AND AUTHORITIES
RE RENEWED MOT. FOR JMOL OR A NEW TRIAL

of the developers, Tony Vu, was hired "in response to the ad posted by Regal specifically to work for Regal." Tr. (Nguyen) at 473:24–474:3, 478:6–8.

Meanwhile, although Sofketeers was responsible for making payment to the developers who were not W-2 employees, Mr. Nguyen admitted that ***the developers were paid when <u>Regal</u> approved of their work***.  Tr. (Nguyen) at 473:12-14 ("Q. The developers knew that if Regal didn't approve of their work, they wouldn't get paid; right? A. That's the understanding.).

This factor strongly favors Regal.

### j.     Whether the work is part of the regular business of the hiring party

While Regal is not a software development company, development and maintenance of its warehouse management software (and related programs) has been a regular part of Regal's business since at least the 1980s. As both Regal's founder (Roque Neeves) and current CEO (Randy Neeves) explained, Regal has hired a variety of computer programmers over the last forty years to develop and maintain its System/36 WMS, to convert the System/36 to a Windows-based platform, to develop additional programs, and to further convert various programs to a .NET platform. *E.g.,* Dep. Tr. (Roque Neeves) at 10:25–11:22, 12:2–6 (describing System/36 and the role of Rocky Phelps); Tr. (Randy Neeves) at 1212:5 ("worked with our System 36 programmer"), 1235:14–1238:21; *see also* Tr. (Ho) at 1302:2–7 ("So I learned it from Rocky Phelps on the VB application, some on System 36, and some from Randy."). Furthermore, the fact that Regal specifically touts the WMS software on its website is a strong indication that the developers it hired to develop and maintain the software were Regal employees. JTX 1809 (screenshot of Regal's website reflecting "Regal's WMS provides complete end-to-end support; from in-transit of incoming product to shipping and delivery visibility.").

24

This factor weighs in favor of Regal. *JustMed,* 600 F.3d at 1127 (finding that where a company marketed to consumers that its software would be constantly updated and hired a computer programmer to work on that software "[i]t seems highly unlikely that . . . [the company] would leave such an important, continuous responsibility to an independent contractor who would terminate his relationship with the company upon completing a working version of the software.").

### k.     Whether the hiring party is in business

As the trial record makes abundantly clear, Regal was (and still is) in business and has provided third party logistics services to its customers throughout the entirety of the its relationship with Softketeers. Dep. Tr. (Roque Neeves) at 8:18–10:24 (describing Regal's business); Dep. Tr. (Garry Neeves) at 12:9–19:15 (similar); Tr. (Randy Neeves) at 1208:15–16 ("About 150, 160 full-time employees"); JTX 167.

This factor weighs in favor of Regal. *Cf. Reid,* 490 U.S. at 753 ("CCNV is not a business at all").

### l.     Provision of employee benefits.

Although Regal did not provide benefits to the developers, Softketeers presented no evidence that any other person or entity, including Softketeers, did either. Furthermore, because this factor "do[es] not bear directly on the substance of the employment relationship—the right to control," courts have cautioned against relying on it "too heavily." *JustMed,* 600 F.3d at 1128.

This factor is neutral.

### m.     Tax treatment of the hired party

Although Softketeers, a corporation, was undoubtedly not a W-2 employee of Regal, the record confirms that at least three of Regal's W-2 employees, Phong Nguyen, Viet Nguyen, and Thang Le, directly authored portions of the source code.

MEM. OF POINTS AND AUTHORITIES
RE RENEWED MOT. FOR JMOL OR A NEW TRIAL

Tr. (Ho) at 1370:18–1373:8; JTX 727; Tr. (Randy Neeves) at 1261:7–12.  Mr. Jawadi, Regal's technical expert, found that the terms "Phong" and "Viet" matched 84 and 31 times in the code, respectively, JTX 2165; JTX 2166; JTX 2167; JTX 2175—certain instances specifically "indicating Phong and Viet authoring code." Tr. (Jawadi) at 1424:7–8, 1423:15–22, 1423:25–1424:1 ("[T]hey were both employees of Regal."), 1428:6–12.[4]  Below are portions of two of the code sections clearly identified as having been authored by Phong Nguyen and Viet Nguyen:



JTX 2166, 2175. And *Mr. Nguyen admitted that at least the portions of code written by Phong Nguyen and Viet Nguyen were included in the codebases for the software at issue*:

> Q.   So you learned along the way that your code just somehow included code written by Phong Nguyen; correct?
>
> A.   That's correct.
>
> Q.   And you've now found out that your code includes code written by Viet Nguyen; correct?
>
> A.   That's correct.

Tr. (Nguyen) at 599:13–18; *see also id.* at 360:8–16 ("Phong Nguyen is a Regal employee."; "Viet Nguyen is also Regal employee . . . ."), 602:15–17.  Meanwhile, other developers who worked on Regal's software that Softketeers now claims to

---

[4]   Defendants previously filed a declaration of Phong Nguyen in conjunction with a motion for summary judgment, confirming his authorship of portions of the code.  ECF. No. 480-14.

own were not employees of either Regal or Softketeers.  *E.g.,* Tr. (Tran) at 1086:19–20 ("Q. And did Softketeers ever issue a W2 to you? A. No.").

Similar to the provision of employee benefits, tax treatment of the hired party "do[es] not bear directly on the substance of the employment relationship—the right to control," and thus courts have stated that "[t]here is a danger . . . in relying on [it] too heavily." *JustMed,* 600 F.3d at 1128; *Mitchell*, 2012 WL 12886845, at *5 (same).

In view of the W-2 tax treatment of several (but not all) of the contributing developers as Regal employees, this factor weighs slightly in Regal's favor.

### n.      Other considerations

Finally, the *Reid* factors do not constitute an exhaustive list of factors relevant to determining whether a hired party is an employee. Restatement (Second) of Agency § 220(2); Tr. (colloquy) at 1578:3–9.  Accordingly, the Court should also consider the affirmative representations made by Softketeers throughout the parties' relationship, which confirmed Regal's understanding that Regal had, and maintains to this day, ownership rights in the software at issue. *See supra* Statement of Facts Section A.  Significantly, Mr. Nguyen never asked for or claimed ownership rights in the software until the end of the parties' relationship.  Tr. (Nguyen) at 493:3–10, 1544:12–15 ("***Q.  In fact, you did not register any copyright registrations until after hiring Mr. Sears and his team; correct?  A. That is correct.***"); Tr. (Randy Neeves) at 1264:1–4; Dep. Tr. (Roque Neeves) at 17:3–5.  Softketeers consistently caused copyright notices to be displayed in the software identifying Regal as the owner of copyright. JTX 1701; JTX 1699; JTX 213; Tr. (Nguyen) at 565:3–566:12, 568:18–21, 570:4–7 ("***Q. So the only copyright information presented to a user of the YMS identifies the owner of the copyright as Regal Logistics; correct? A. That's correct.***"), 571:3–6 ("***[Q.] Regal's customers who used the MyRegal portal were presented with copyright notices identifying Regal as the owner; correct? A. Yes.***").

27

And the developers believed they were work-for-hire employees of Regal. Tr. (Ho) at 1299:14–18 ("***My impression Regal own it because I been working for, like, multiple company, and the contractor just get paid and walk out after the project is done.***"), 1300:7–10; Tr. (Doan) at 869:20–24 ("***I think it belong to Regal***, so why I need to encrypt it for."); Tr. (Tran) at 1078:20–21 ("***I thought the code belong to Regal.***"). Indeed, it is telling that nobody other than Mr. Nguyen testified on Softketeers's behalf.

Accordingly, ***Regal*** is the exclusive owner of the software under the work-for-hire doctrine and thus cannot be liable for copyright infringement or trade secret misappropriation as a matter of law. *See Richmond*, 353 F.2d at 42 ("[A] copyright owner cannot infringe against his own copyright."); *Gagnon,* 542 F.3d at 752.

### 2.    Regal Is the Exclusive Owner as a Borrowing Employer

Examining the relationship between Regal and Softketeers (as the party with whom the developers contracted), as opposed to the relationship between Regal and the developers themselves, renders the same result: that Regal was the employer of the developers and is thus the exclusive owner of the software. *See Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1123 (11th Cir. 2011); *Cruz v. Nat'l Steel and Shipbuilding Co.*, 910 F.3d 1263, 1268 (9th Cir. 2018); *Parker v. Joe Lujan Enters., Inc.*, 848 F.2d 118, 119 (9th Cir. 1988). For the reasons explained in Section I.C above, "[t]he critical factual inquiry"—"the location of the power to control the servant"—points only to Regal. *United States v. N.A. Degerstrom, Inc.*, 408 F.2d at 1130, 1133 (9th Cir. 1969) (quoting *McCollum v. Smith*, 339 F.2d 348, 351 (9th Cir. 1964)); *Cruz*, 910 F.3d at 1268.

Specifically, Regal controlled the development of the custom software by specifying its functional requirements. Dep. Tr. (Garry Neeves) at 53:15–19; JTX 235; Tr. (Nguyen) at 467:22–468:2 (confirming that Mr. Nguyen received the

requirements reflected in JTX 235 from Regal), 469:14–470:20 (confirming that Regal personnel provided requirements for each of the software programs); JTX 2181.091 at SOFT128338 (invoice descriptions reflecting work performed on the software based on requests by Regal employees). Additionally, Softketeers put its developers "at the disposal and under the control of [Regal] for the performance of" the requested software development services by agreeing that payment for these services was contingent on Regal's approval, and as such the developers are "to be dealt with as [that] of [Regal] and not of [Softketeers]." *Cruz*, 910 F.3d at 1268 (quoting *Denton v. Yazoo & Miss. Valley R.R. Co.*, 284 U.S. 305, 308 (1932)).

Accordingly, because the developers were (at minimum) borrowed employees of Regal, any rights the developers obtained in the software vested with Regal.

### 3.   Alternatively, Regal Is At Least a Co-Owner

At minimum, Regal is a co-owner of the software because the evidence presented at trial undisputedly established that at least two Regal W-2 employees— Phong Nguyen and Viet Nguyen—authored certain portions of the code within the scope of their employment for Regal. JTX 2166; JTX 2175; Tr. (Nguyen) at 599:13–18, 602:15-17; Tr. (Ho) at 1370:18–1371:22; Tr. (Jawadi) at 1423:15–1424:1. When a work is "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole," the work is deemed a "joint work," of which each author is entitled to an equal and undivided interest. 17 U.S.C. §§ 101, 201(a) ("The authors of a joint work are coowners of copyright in the work."); *Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978). Because Phong Nguyen and Viet Nguyen were undisputedly Regal employees when they authored portions of the code merged into the copyrighted works, Tr. (Nguyen) at 360:8-16; Tr. (Randy Neeves) at 1261:7-12, Tr. (Ho) at 1370:18-23, their ownership interests vested with Regal. 17 U.S.C. § 201(b).

29

The Ninth Circuit has established three criteria to determine whether a work is a joint work, two of which are relevant here: (1) "whether the putative coauthors made objective manifestations of a shared intent to be coauthors," and (2) "whether the alleged author superintended the work by exercising control." *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008) (citing *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000)). "Control will often be the most important factor." *Id*.[5]

The evidence presented at trial confirms that both are satisfied based on Regal's direction and control over the development of the software, including those portions authored by Phong Nguyen and Viet Nguyen.  Indeed, the software was customized for Regal's business, such that "the software [] follow[ed] the business wherever the business" went. Tr. (Nguyen) at 396:7–14; Dep. Tr. (Garry Neeves) at 47:7–8. Accordingly, it was *Regal*, not Softketeers, that superintended the copyrighted work. *E.g.*, Tr. (Nguyen) at 460:12–18, 461:2–4, 462:25–463:2, 463:17– 20, 464:24–465:3, 465:6–24, 466:6–11, 467:1–3, 467:22–468:2, 469:15–18, 469:20–22, 470:5–7, 470:18–20, 473:12–14; Tr. (Randy Neeves) at 1259:3–1262:11, 1265:7– 1269:7; Tr. (Tran) at 1074:13–23, 1075:21–1076:2, 1079:13–18; Dep. Tr. (Garry Neeves) at 53:15–19; JTX 235; JTX 2181.091 (invoice descriptions reflecting work performed on the software based on requests by Regal employees).  Regal's exercise of such control not only demonstrates that Regal superintended the work of both Phong Nguyen and Viet Nguyen (factor 2), but is also an objective manifestation of shared intent to be at least co-authors of the software with Softketeers (factor 1).  Softketeers failed to present any evidence that the parties did not possess the requisite shared intent to be

---

[5]   The third factor—"whether 'the audience appeal of the work' can be attributed to both authors and whether 'the share of each in its success cannot be appraised"— was developed in the context of movies and is thus inapplicable to the fact of this case. *Aalmuhammed*, 202 F.3d at 1234–35; *see* ECF No. 639 at 10.

co-authors; rather, Mr. Nguyen admitted that the software was created specifically for Regal, that Regal provided specifications for the software, and that Regal was required to approve of all work performed prior to paying any of the developers. *E.g.*, Tr. (Nguyen) at 460:12–15, 467:1–3, 467:22–468:2, 473:12–14.

Accordingly, Regal is at least a co-owner of the software and cannot be liable for copyright infringement or trade secret misappropriation as a matter of law. *Oddo v. Ries*, 743 F.2d 630, 632–33 (9th Cir. 1984) ("A co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright.").

**B.   Defendants are Entitled to Judgment as a Matter of Law Copyright Infringement and for Trade Secret Misappropriation Because Softketeers Abandoned Any Ownership Rights in the Software**

"It is well settled that rights gained under the Copyright Act may be abandoned. [A]bandonment of a right must be manifested by some overt act indicating an intention to abandon that right." *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1114 (9th Cir. 1998) (citing *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960)); *see also Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1398 (C.D. Cal. 1990) ("Abandonment occurs when the copyright proprietor intends to surrender a copyright interest in his work. To find abandonment, the copyright owner must have clearly manifested that intention through some affirmative act." (citations omitted)). Such overt acts include acquiesced circulation of the work without a copyright notice, or public statements of renouncement of copyright. *White v. Kimmell*, 193 F.2d 744, 745 (9th Cir. 1952); *Melchizedek v. Holt*, 792 F. Supp. 2d 1042, 1051–54 (D. Ariz. 2011); *Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 992 (C.D. Cal. 2015); *Lopez v. Elec. Rebuilders, Inc.*, 416 F. Supp. 1133, 1135 (C.D. Cal. 1976). Subjective intent cannot overcome the objective manifestation of abandonment. *Hadady*, 739 F. Supp. at 1399.

As demonstrated in the trial testimony, throughout the parties' relationship, Softketeers repeatedly represented that Regal, not Softketeers, held ownership interests in the software. Defendants presented (uncontroverted) evidence that Softketeers inserted copyright notices into user-facing screens of the MyRegal/MyWMS, YMS, TMS, and TMS Mobile applications stating that Regal—and not Softketeers—owned rights in the software programs. JTX 1701; JTX 1699; JTX 213. Tr. (Nguyen) at 565:3–566:12, 568:18–21, 570:4–7 ("Q. So ***the only copyright information presented to a user of the YMS identifies the owner of the copyright as Regal Logistics***; correct? A. That's correct."), 571:3–6 ("[Q.] ***Regal's customers who used the MyRegal portal were presented with copyright notices identifying Regal as the owner***; correct? A. Yes.").  Mr. Nguyen admitted that his team posted pages to Regal's website "***stating to the world that the WMS was Regal's WMS***."  Tr. (Nguyen) at 575:25–577:8; JTX 1809.  Indeed, Softketeers could not point to a single copyright notice identifying itself as the copyright holder in any of the software programs. Tr. (Nguyen) at 410:23–411:1, 570:1–3. Additionally, Mr. Nguyen admitted that Softketeers never represented to Regal that it intended to claim sole ownership of the software until after the parties' relationship ended. Tr. (Nguyen) at 493:3–10; *see also* Tr. (Randy Neeves) at 1264:1–4; Dep. Tr. (Roque Neeves) at 17:3– 5. Specifically, Mr. Nguyen admitted that he, Randy Neeves, and Garry Neeves sought to *jointly* sell the software to third parties at various points in the parties' relationship, going so far as to create a separate entity called MGR—"Minh, Garry, Randy"—under which the software would be sold. Tr. (Nguyen) at 415:19–416:3.

Such actions are clear, affirmative acts that constitute abandonment in any ownership rights on behalf of Softketeers. *E.g.*, *Seshadri v. Kasraian*, 130 F.3d 798, 805 (7th Cir. 1997) (explaining in dicta that had plaintiff authorized defendant or another to publish work under defendant's sole name, such an action would

32

constitute abandonment as a public disclaimer); *Rouse v. Walter & Assocs., L.L.C.*, 513 F. Supp. 2d 1041, 1069–70 (S.D. Iowa 2007) (finding abandonment where copyright notices were placed in screen displays and public facing agreements); *cf. Gagnon*, 542 F.3d at 757 (explaining that copyright notice on splash screens with claimant's name meant that copyright claimant intended to retain copyright ownership over programs); *Moffat v. Academy of Geriatric Physical Therapy*, 2016 WL 7422259, at *12 & n.10 (W.D. Wisc. Dec. 22, 2016) (explaining that where legend printed on handouts explained that they were the "property of the Academy," "it is hard to see how anyone could come away . . . thinking that the course instructors would own the exclusive rights to the course materials").

Accordingly, because Softketeers affirmatively represented that Regal owned the software and failed to claim any ownership interest of its own, Softketeers abandoned all ownership rights in the software; Defendants cannot be held liable for any alleged infringement or misappropriation of such software as a matter of law.

### C. Defendants are Entitled to Judgment as a Matter of Law Copyright Infringement and for Trade Secret Misappropriation Because Regal Has At Least an Implied License to Use, Retain, and Modify the Software

An implied license exists when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Gagnon*, 542 F.3d at 754–55 (footnote omitted) (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)). As for the third prong, in the context of "implied licenses for computer programs," the Court looks not solely at copying and distribution, but rather at the "protected right at issue," such as the right to "use, retain and modify the programs." *Id.* at 755. "The burden is on the licensor 'to express an intent to . . . limit . . . [the] license if he

33

intended to do so . . . [and a] belated statement . . . [i]s not sufficient . . . ." *Signorelli v. N. Coast Brewing Co.*, 2019 WL 2569582, at *3 (N.D. Cal. June 21, 2019) (quoting *Gagnon*, 542 F.3d at 756). As the Court has already held, "if Regal had an implied license, then it could not have infringed Softketeers's copyright." ECF 939 at 32.

Application of the three-factor test confirms that Regal obtained an implied license to the software at issue that was not limited in scope. Mr. Nguyen admitted that Regal requested the creation of, and Softketeers did indeed create, the software. Tr. (Nguyen) at 460:12–15, 469:14–470:20 (confirming that he received requirements for each of the programs from Regal); JTX 235. And Mr. Nguyen admitted that Softketeers routinely delivered executables for the software to Regal. Tr. (Nguyen) at 303:4 ("The first WMS was delivered around June 2001."), 347:11–12 ("sometimes you need to install a new delivery"). Mr. Jawadi's testimony confirmed that by delivering such executables—which were indisputably unobfuscated, Tr. (Nguyen) at 398:12–13; Tr. (Doan) at 869:20–24; Tr. (Tran) at 1078:13–15—Softketeers delivered a functional equivalent of the source code underlying the software to Regal. *See infra* Section III.D; *compare* JTX 1799 (decompiled source code) *with* JTX 1800 (original source code). As Mr. Jawadi explained and Mr. Alepin did not refute, the unobfuscated executables that Softketeers repeatedly delivered could be readily decompiled to reveal the source code underlying the software. *Id.*

Even giving Softketeers the benefit of all reasonable inferences, the trial record establishes that Softketeers intended that Regal use, retain, and modify the software at issue when it delivered the executables to Regal. "Intent to create a license exists when an author creates a work with the knowledge and intention that it will be used by the licensee for a specific purpose." *Fontana v. Harra*, 2013 WL 990014, at *4 (C.D. Cal. Mar. 12, 2013). "The relevant intent is the licensor's objective intent **at the time of creation and delivery of the software** as manifested

34

by the parties' conduct." *Gagnon*, 542 F.3d at 756 (emphasis added). In determining whether such intent exists, the Court considers three factors:

> whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*Id.* (citations omitted) (modifications in original). All three of the *Gagnon*-intent factors demonstrate that, as a matter of law, Regal holds an implied license to the use, retain, and modify the software and underlying source code.

First, despite working together for nearly twenty years, Softketeers never discussed copyrights or expressed to Regal that it intended to deny Regal a license to the software at any time before the termination of Regal's relationship with Softketeers. *E.g.*, Tr. (Nguyen) at 493:3–10; Dep. Tr. (Roque Neeves) at 16:17–24, 17:3–5, 56:2–13; *see also* Tr. (Ho) at 1299:6–25, 1300:7–10; *see, e.g.*, *Numbers Licensing, LLC v. bVisual USA, Inc.*, 643 F. Supp. 2d 1245, 1253 (E.D. Wash. 2009) (finding that 3-and-a-half-year delay in expressing intent to retain rights in source code militated towards finding of implied license).

Second, all parties agree that no written contract was ever executed between Regal and Softketeers, much less a contract limiting Regal's right to use, retain, or modify the software or underlying source code. Tr. (Nguyen) at 551:24–25; Dep. Tr. (Roque Neeves) at 17:6–18. The failure to express an intent to retain rights in developed software at issue, in writing or otherwise, has been found to be powerful proof of an implied license. *See, e.g.*, *Numbers Licensing*, 643 F. Supp. 2d at 1253 ("When a license has not been denied and substantial sums of money are paid for the copyrighted work, the absence of a licensing agreement supports the finding of

35

an implied licensing. . . . Numbers' failure to obtain a written agreement retaining licensing rights supports finding of an implied license.").

Finally, Softketeers's conduct compels the conclusion that it intended to permit Regal's ongoing use and modification thereof. Specifically, Softketeers routinely delivered unobfuscated executables to Regal without any contractual restriction on Regal's right to decompile and subsequently modify the software. *Gagnon*, 542 F.3d at 755 n.4 (stating that delivery is "one factor that may be relied upon in determining that an implied license has been granted." (quoting *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 n.6 (9th Cir. 1990))). Softketeers included copyright notices identifying Regal as the holder of copyright in the software. JTX 1701; JTX 1699; JTX 213; Tr. (Nguyen) at 564:20–565:9, 567:6–20; Tr. (Ho) at 1376:19–1377:20; *see, e.g.*, *Numbers Licensing*, 643 F. Supp. at 1254 ("Mr. Renfroe's conduct on three (3) separate occasions demonstrates that he did not intend to deny bVisual use of the System's source code. First, Mr. Renfroe inserted the copyright notice 'Numbers Consulting for bVisual, copyright' 112 times in the source code. No claims of copyright ownership were made by Mr. Renfroe at this time."); *cf. Oliver v. Johanson*, 357 F. Supp. 3d 758, 784–85 (W.D. Ark. 2018) (finding implied license where plaintiff "inserted copyright notices in favor of the [defendant] into the code"). And at no point did Softketeers object to including these copyright notices, nor did Softketeers ever register copyrights in the software—or inform Regal of its intention to do so—before the parties ended their 18-year relationship. Tr. (Nguyen) at 490:17–20, 493:3–10; *see Numbers Licensing*, 643 F. Supp. at 1254 (crediting lack of claim of copyright ownership as fact weighing in favor of finding an implied license).

Other factors also compel a finding that Softketeers granted Regal an implied license to use, retain, and modify the software. For example, Regal paid nearly $17

36

million to Softketeers to develop and provide the software at issue—customized to Regal's specifications, Tr. (Nguyen) at 396:13–14 ("[T]he software will follow the business wherever the business goes."), 460:12–15 ("Q. Okay. Mr. Nguyen, you would agree that each of the software programs at issue in this case was specifically custom made for Regal; correct? A. That's correct."), 469:14–470:20 (admitting that Regal personnel provided requirements for each of the software programs); JTX 235 (written specification provided by Regal)—to Regal. Tr. (Riley) at 1478:6–7; Tr. (Cragun) at 1154:8–12; *see, e.g.*, *Yates v. Adams*, 15-CV-4912, 2017 WL 783520, at *3 (N.D. Cal. March 1, 2017) (rejecting argument that payments were for labor, not for the software itself, where work performed was for "custom software [that] is far less valuable without the ability to modify it" (alteration in original) (quoting *Gagnon*, 542 F.3d at 757)); *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 123–24 (S.D.N.Y. 2012) ("The fact that the parties contemplated the payment of significant amounts of money for particular works speaks to their intent that a license to use that work be transferred."); *see also Gagnon*, 542 F.3d at 756–57 (holding that "***it defies logic that [the licensee] would have paid [licensor] for his programming services if [licensee] could not have used the programs without further payment pursuant to a separate licensing arrangement . . . never otherwise requested at the time***"). Furthermore, these payments confirm that such a license was irrevocable. *Oliver*, 357 F. Supp. 3d at 785 ("In general, the law is clear that where consideration is paid, the license is irrevocable."); *Gagnon*, 542 F.3d at 757 ("Furthermore, because AMS paid consideration, this license is irrevocable").

Because Softketeers granted Regal an irrevocable implied license to use, retain, and modify the software and underlying source code, Regal cannot be liable for copyright infringement or trade secret misappropriation as a matter of law.

37

**D.      Defendants are Entitled to Judgment as a Matter of Law for Trade Secret Misappropriation Because Softketeers Failed to Establish that it Took Reasonable Measures to Maintain the Secrecy of the Source Code**

In order for a trade secret to exist, under both California and federal law, the trade secret owner must take reasonable steps to keep the information secret. 18 U.S.C. § 1839(3)(A); Cal. Civ. Code § 3426.1(d)(2). Indeed, "the extent of the [trade secret] property right . . . is defined by the extent to which the owner of the trade secret protects his interest from disclosure to others." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). Even crediting Softketeers's evidence, no reasonable jury could conclude that Softketeers took reasonable measures to protect the software source code that it now claims was its trade secret.

First, the source code cannot qualify for trade secret protection because Softketeers routinely delivered unobfuscated executable files to Regal. Tr. (Nguyen) at 398:12–13; Tr. (Doan) at 869:20–24 ("No. I think it belong to Regal, so why I need to encrypt it for."); Tr. (Tran) at 1078:13–15. "It takes just literally minutes to decompile [unobfuscated] source code" into human-readable source code. Tr. (Jawadi) at 1405:19–1406:4. As Defendants' expert, Mr. Jawadi, explained, even if the original and decompiled source code is not word-for-word identical—though, "in some cases, it could be identical," Tr. (Jawadi) at 1407:9–15—nothing valuable or useful in understanding the original source code is lost during decompilation. Tr. (Jawadi) at 1407:18–1408:22. By contrast, ***Softketeers provided no evidence, through its expert Mr. Alepin or otherwise, demonstrating that <u>any</u> differences between the original and decompiled source code were economically valuable***. Having thus disclosed everything that could conceivably have economic value, Softketeers forfeited any trade secret protection in the underlying source code. *See, e.g.*, *Arkeyo, LLC v. Cummins Allison Corp.*, 342 F. Supp. 3d 622, 628 (E.D. Pa. 2017) (finding that there was no trade secret protection where the plaintiff did not use

38

obfuscation). Nor did Softketeers provide any evidence that Regal was contractually prohibited from decompiling the executables—an otherwise standard protection in the industry. Softketeers's failure to obfuscate, especially when combined with its lack of contractual restriction, deprives it of trade secret protection as a matter of law.

Second, the source code itself was regularly stored on *Regal's* servers. For example, Mr. Nguyen acknowledged that the source code was stored on Regal's servers during live debugging. Tr. (Nguyen) at 630:8–17. Other witnesses confirmed that, for many years, the source code was regularly stored on Regal's servers. Tr. (Tran) at 1077:19–1078:7; Tr. (Ho) at 847:1-19; Tr. (Randy Neeves) at 1262:22–1263:19. And Mr. Nguyen further acknowledged that he sent portions of code to Randy Neeves by email. Tr. (Nguyen) at 620:6–9; JTX 238; JTX 250.

Third, though Softketeers used rudimentary passwords, they were weak, based on well-known facts about Mr. Nguyen, and hardly changed. *E.g.*, Tr. (Tran) at 1081:13–19. The password for the server containing the software was accessible by all employees and was changed only once over the course of Thai Tran's lengthy employment. Tr. (Tran) at 1081:20–23. Additionally, SourceSafe, the program housing the code on the server, was protected by a generic password scheme where any employee's first name could act as both the username and the password.

Moreover, Softketeers's physical server was readily accessible to non-employees during poker tournaments held at the Softketeers office and was even used by those non-employees. Tr. (Tran) at 1081:1–12; Tr. (Ho) at 1385:7–23. The server was not placed in a locked room, but instead was accessible to anyone who walked into the office. *Id.*; Tr. (Tran) at 1079:25–1080:7; *see Iskander v. Laugh Factory*, 2020 WL 2114939, at *8 (C.D. Cal. 2020) (finding that no reasonable jury could conclude that the trade secret owners took appropriate measures to protect their trade secret when they did not keep their business records in a secure location). Thus, Softketeers'

39

protections were hardly well-designed to keep out outsiders; as the undisputed testimony reflected, those not employed by or contracting with Softketeers, such as Mr. Nguyen's friends and partygoers, were permitted access to the source code server for other purposes. Tr. (Tran) at 1079:25–1080:7, 1081:1–12; Tr. (Ho) at 1385:7–23.

Finally, even if Softketeers might otherwise have maintained trade secret protection (it did not), any such protection was extinguished—at least for the core WMS code—when Softketeers undisputedly sent source code to RXN. When a trade secret holder shares a purported trade secret with a third party that has no duty to keep the information secret that information cannot qualify as a trade secret. *See VBS Distrib. v. Nutrivita Labs., Inc.*, 811 F. App'x 1005, 1009 (9th Cir. 2020); *Iskander*, 2020 WL 2114939, at *8 ("[I]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."). Even information disclosed to a small audience can prevent the trade secret owner from asserting trade secret protection. *See JBF Interlude 2009 Ltd. v. Quibi Holdings LLC*, 2020 WL 9311954, at *17 (C.D. Cal. 2020). Here, Softketeers's disclosure of the subject source code to RXN is undisputed. JTX 2191; Tr. (Nguyen) at 621:19–622:13, 623:16–624:2. In view of this evidence, no reasonable jury could have concluded that RXN was not in possession of the WMS code. Nor did Softketeers attempt to demonstrate that RXN was under a confidentiality obligation. So, as far as the record is concerned, Softketeers cannot justify trade secret protection over the software.

Softketeers's repeated failures to employ methods of securing the source code—including a failure to obfuscate, to use sufficiently rigorous user profile and password protections, to contractually protect its work, and by allowing others easy access to the machines containing it—destroy any trade secret protection that Softketeers otherwise might have claimed. Thus, without a trade secret to be

40

misappropriated, Softketeers could not possibly have presented a sufficient case of trade secret misappropriation.  This, of course, is not surprising, as the developers always understood that Regal (not Softketeers) owned the software.  Tr. (Doan) at 869:20–24 ("*I think it belong to Regal, so why I need to encrypt it for.*"); Tr. (Tran) at 1078:13–16, 20–23 ("*I thought the code belong to Regal.*").

### E.   Defendants are Entitled to Judgment as a Matter of Law of No Indirect Profits for Copyright Infringement and No Unjust Enrichment Claims for Trade Secret Misappropriation Because Softketeers Failed to Prove that These Damages Were Caused by Any Infringement/Misappropriation

In its verdict, the jury entered an award of Regal's "profits" in the amount of $3,320,000 and of Randy Neeves's "profits" in the amount of $100,000.  ECF No. 823 at 5, 13 (same as unjust enrichment).  The only theory, however, presented by Softketeers through evidence or argument to support any profit disgorgement/unjust enrichment damages award was a legally invalid indirect profits theory—*i.e.*, that all of Regal's profits earned from the physical warehousing of customers' goods are somehow indirectly derived from Regal's use of WMS software.  *E.g.*, Tr. (Cragun) at 1125:24–1126:1 ("It is my opinion that all of Regal's business warehouse profit is attributable to the infringement of the copyrights.")

Copyright law permits a plaintiff like Softketeers to recover, in addition to actual damages, "any profits of the infringer that are *attributable to the infringement* and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b).  And similarly (but not identically), the trade secret statutes permit recovery of damages for "unjust enrichment *caused by* the misappropriation of the trade secret that is not addressed in computing damages for actual loss."  18 U.S.C. § 1836(b)(3)(B)(II); *see* Cal. Civ. Code § 3426.3(a) (substantively identical); *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).  **But courts have consistently held that profits derived from <u>mere use</u> of copyright software are not themselves**

41

*sufficiently attributable to the infringement to cause recoverable indirect profits*. *See, e.g.*, *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 2013 WL 5970065, at *11 (S.D.N.Y. Nov. 8, 2013); *DaimlerChrysler Servs. v. Summit Nat.*, 2006 WL 208787, at *3 (E.D. Mich. Jan. 26, 2006); *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, 2013 WL 1775437, at *4–5 (S.D.N.Y. Apr. 25, 2013); *Mojica v. Bos. Coll.*, 2004 WL 5708263, at *1–2 (D. Mass. Jan. 9, 2004); *ECIMOS, LLC v. Carrier Corp.*, 2017 WL 10221053, at *1 (W.D. Tenn. Feb. 1, 2017).  As one commentator has explained, "Because of the at-best highly speculative nature of all indirect profits claims" such as those at issue here, the decision to "send[ ] such claims to a jury should be extremely rare." 6 William F. Patry, *Patry on Copyright* § 22:131 (2010).

This was not the appropriate case.  Even taking the facts in Softketeers's favor, **Softketeers presented no evidence that any mere use of the copyrighted software generated a single dollar of profit for Regal, and by extension, Mr. Neeves**.  For example, there was no customer testimony that the software drove sales whatsoever. As one court put so colorfully, "**[Defendant] could not operate without its toilets either, but that does not mean that all of its profits are attributable to commodes.**" *DaimlerChrysler Servs.*, 2006 WL 208787, at *3.  Yet that is precisely the theory that Softketeers put to the jury. It is a legally insufficient one, for both the copyright and trade secret misappropriation claims. *See Science of Skincare, LLC v. Phytoceuticals, Inc.,* 2009 WL 2050042, at *5 (C.D. Cal. July 7, 2009) (finding inadequate proof of damages as a matter of law where "Plaintiff ha[d] not sufficiently shown a causal link between a potential misappropriation of a trade secret and the alleged damages").  Accordingly, Defendants are entitled to JMOL vacating the jury's profit disgorgement and unjust enrichment awards.

Alternatively, under the more relaxed standards of Rule 59, the Court should grant a new trial because this theory was impermissibly presented to the jury.  Under

this theory, the damages verdict is clearly excessive, so the Court may grant a new trial unless the plaintiff accepts a remittitur reflecting "the maximum amount sustainable by the proof." *Oracle Corp.*, 765 F.3d at 1094.

## IV.   ADDITIONAL GROUNDS FOR A NEW TRIAL

Ultimately, and as reflected in the arguments above, this case is and always has been about whether Regal was entitled to engage in ongoing use and modification of the custom software that it designed, oversaw the development of, and paid for to the tune of over $17 million.  From the outset of this case, Defendants have argued consistently that Regal owns or at minimum has an irrevocable implied license to the software.  Softketeers, by contrast, has worked to focus this case on anything other than these core issues.  The result was a trial dominated by testimony, "evidence," and argument that was ***unrelated legally*** to issues of ownership or license but, worse, ***would tend to distract*** the jury from such issues and ***would tend to prejudice*** the jury about such issues.  Even if this Court finds that sufficient evidence exists to support the jury's verdict—for the reasons above, it should not do so—a new trial is warranted to ensure that Defendants receive a fair trial (whether before judge or jury) on the fundamental issues of ownership and license.

### A.   Neither the Court nor the Jury Has Made Findings of Fact or Conclusions of Law on the *Reid* Factors or Implied License

As an initial matter and as the Court is acutely aware, the issues of ownership and implied license should be front and center in this case.  But the Court did not instruct the jury that it *must* fully assess the issue of ownership prior to reaching a conclusion on copyright infringement or trade secret misappropriation.  Nor did the Court instruct the jury that it *must* assess whether Regal has an irrevocable implied license.  Instead, it instructed the jury that it was permitted to conclude that Softketeers owned the copyrights ***solely*** on the basis of the copyright registrations.  Tr. at 1574:10-17 ("***From these certificates, you may, but need not conclude, that***

43

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***Softketeers owns the copyrights for the software identified therein.***").  From that
instruction, the jury could reach its verdict on the issue of copyright infringement
without ever considering other issues of ownership including work-for-hire
ownership or joint ownership or of implied license.

This, of course, would not be a significant problem, if the Court took up the
issue of ownership and implied license in the first instance, as the parties had
anticipated.  *See, e.g.*, ECF No. 571 at 44 ("Softketeers contends the following issues
should be tried to the Court:  1. Ownership of Softketeers' copyrights under work-
for-hire, including counterclaim 5 for declaratory judgment that Regal owns the
Software."); ECF No. 753 at 36 (same); ECF No. 750 at 28 (Defendants' identifying
"[a]ll declaratory judgment counterclaims" as issues "triable to the Court"); ECF
No. 761-1 at 11; ECF No. 764-1 at 34; ECF No. 772-1 at 32; Tr. at 1350:25–1351:1
(work-for-hire ownership "is a question for the Court and need not go to the jury");
Tr. at 1535:1–4 ("Softketeers and Minh Nguyen do not consent pursuant to Rule
39(c)(2) to be bound by the jury verdict on any issues not triable to the jury, such as
. . . work for hire."); ECF No. 833 at 3 (agreeing by stipulation that Defendants'
Counterclaim 5 "require[s] adjudication by the Court").  But in the Court's later
Findings of Fact and Conclusions of Law on Regal's counterclaims and affirmative
defenses, ECF No. 939, the Court "assume[d] the jury found certain facts," *id.* at 13,
including an assumption that "the jury necessarily must have found that Softketeers
and the other software developers were not Regal employees."[6]  *Id.*  And based on
this assumption, the Court also did not perform a *Reid* factors analysis.

---

[6]      The jury found no such thing—and certainly made no express findings or
conclusions—as the jury instructions did not specifically charge the jury with
determining if the software at issue was a work made-for-hire, and the verdict form
did not require the jury to return any verdict on this issue.

If the Court finds that it is somehow constrained in its ability to engage in this analysis in the first instance at this stage, then the Court should grant Regal's motion for a new trial—a new trial in which this issue can be squarely presented to the Court or the jury. (As both parties have maintained, the issue is properly one for the Court.)

## B.   The Trial Presentation Distracted from and Prejudiced Against the Central Issues of Ownership and License

To the extent the Court maintains its view that the jury has already impliedly made all necessary findings and has impliedly reached conclusions on the issues of ownership and implied license, a new trial is nonetheless warranted because any such findings and conclusions were prejudiced by irrelevant testimony, "evidence" and argument. Simply put, the Court should at minimum grant a new trial, because the September 2021 trial "was not fair" to Regal. *Claiborne*, 934 F.3d at 894.

### 1.   The Court Permitted the Jury to Receive Evidence and Argument Regarding Prior Settlement Offers

Rule 408 is clear on its face: evidence of compromise negotiations is not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408. The Ninth Circuit has consistently held that introduction of settlement communications is rarely appropriate, because it is almost always highly prejudicial. *See Rhoades v. Avon Prod.*, Inc., 504 F.3d 1151, 1161 (9th Cir. 2007).

Nonetheless, here, the Court permitted the jury to hear (over Regal's objection, ECF No. 537 (Regal's Motion *in Limine* No. 5); ECF No. 737 at 21:9–23:10 (order denying motion)) evidence that Regal had previously made settlement offers to Mr. Nguyen in 2011 and 2018. And at trial, Regal's concerns were immediately borne out. As early as opening statements, Softketeers's counsel introduced the jury to the theory that Regal's prior settlement offers were somehow evidence that Regal did not own the software. Tr. (Sears Opening) at 185:4–11;

45

186:25–187:25.   And Softketeers carried this theme through trial, closing with statements like, "***You don't buy something you already own . . . in 2011, Regal offered to buy joint ownership of the software for $1.5 million.***" Tr. at 1639:18–19.

A jury hearing such "evidence" and argument ***during the first few minutes of trial*** may readily reach the conclusion that Regal did not own the software before a single witness takes the stand.  But as the Court is well-aware, settlement offers— and especially settlement offers at numbers less than litigation cost—rarely reflect a defendant's actual belief that it is liable.  And a party's subjective beliefs regarding issues of ownership is of little (if any) weight in a determination of whether the party is entitled to ownership as a matter of law.  This is exactly why Rule 408 bars the admission of settlement discussions.  This trial was tainted from the very start in light of these statements and theme; a new trial is warranted on this basis alone.

### 2.   The Court Permitted the Jury to Hear Biased Testimony About Purported Privileged Communications

At trial, the Court also permitted the jury to hear (over objection and after protracted discussion) as "evidence" testimony from Garry Neeves to the effect that an attorney for Regal, William Holt, Esq., had purportedly told him that Softketeers owns the software at issue in this case.  Dep. Tr. (Garry Neeves) at 189:17–20.  If true,[7] such testimony was an improper disclosure of a privileged communication.  Regardless, ***the highly prejudicial nature of Garry Neeves's testimony far outweighed any probative value it could have had***.

Indeed, as the Court was made aware at trial, Mr. Holt was Regal's corporate real estate attorney.  Tr. (Randy Neeves) at 764:18–20.  He is and was not a copyright

---

[7]   The extent of Garry Neeves's bias is significant.  Although Garry Neeves had not seen or spoken to his father for several years, he filed an incapacity action against Roque Neeves in January 2022.  This, despite the fact that Roque Neeves was deposed in this action in August 2021, and his testimony was accepted by this Court without objection in September 2021.

lawyer.  Tr. (Randy Neeves) at 764:3–16.  The error in admitting this privileged communication is compounded by the fact that it is also hearsay and irrelevant.  Whether Garry Neeves (or even Bill Holt) had an opinion regarding Regal's ownership of the software is completely irrelevant to whether, as a matter of law, Regal is the work-for-hire owner of the software.  The Court's admission of "evidence" regarding Garry Neeves's purported beliefs was highly prejudicial to Regal and could have misled the jury to reach the verdict it did.

### 3. The Court Presented the Jury with an Adverse Instruction as to the Replacement Software and Prevented Regal from Introducing Contrary Evidence

Compounding these issues, the Court presented the jury (again, over Regal's objection) with the following adverse inference instruction:

> If you conclude that Regal's Vietnam-based developers used or had in their possession source code for the software at issue, then you must presume that the Vietnam-based developers received that source code from Regal.

Tr. at 1582:9–13.  Like all adverse inference instructions, which are rarely appropriate, *this instruction necessarily tilted the judicial balance in favor of Softketeers over Regal*.  *See Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 824 (9th Cir. 2002).

Even at the time it was crafted, it was clear that this punitive instruction was unwarranted and would have significant adverse consequences on the trial of this case.  Although courts in the Ninth Circuit look to "legal control" rather than "practical control" as the appropriate test for determining a party's obligation to collect and produce materials in discovery, *e.g.*, *Quest Integrity USA, LLC v. A.Hak Indus. Servs. US, LLC*, 2016 WL 4533062, at *5 (W.D. Wash. 2016); *In re Citric Acid Litigation*, 191 F.3d 1090, 1107–08 (9th Cir. 1999), *the Special Master relied on a theory of "practical control" and wrongly crafted the instruction* as a remedy

47

for Regal's inability to produce foreign third-party materials—a source code management system—over which ***Regal had no <u>legal</u> control***.  ECF No. 659 at 15–16.  The upshot: ***the jury was effectively instructed to assume liability***.

The prejudice caused to Defendants by the Court's adverse inference instruction was then ***compounded*** by the Court's decision to prohibit Defendants from introducing exculpatory evidence.  Specifically, Defendants were barred from presenting evidence, including Exhibit 2202 and related testimony, to the effect that a comment embedded in the source code for Regal's replacement software was not an artifact of copying but was in fact ***planted*** in the new source code mid-development by an otherwise unknown developer.  Tr. at 1189:15–16 (excluding Exhibit 2202).  At the time, Defendants made the following proffer:

> For the benefit of the Court's records, the defendants state that, were Exhibit 2202 admitted into evidence, Mr. Vu Ho would have been in a position to testify with respect to his receipt of this document, his consideration of this document, and the impact of this document on his state of mind with respect to the issue of whether any Softketeers originated source code had been used for purposes of creating replacement code.

> Mr. Ho would further testify to his understanding that, based on this e-mail, that the comment that has been informally referred to in this record as the Minh comment, had been planted into this code after code was originally written and was not suggestive of any copying.

> On that basis, he was and remains satisfied that Regal's subcontractors were performing their work as instructed, with such work being performed solely based on executable files provided by Regal, which, of course, they were able to decompile because they had been unobfuscated.

> Other witnesses from Regal, including Randy Neeves, Thai Tran, Trung Doan, and Kevin Pham, would also have been in a position to testify regarding their understandings as informed by the response Mr. Ho received from his counterpart project manager in Vietnam to like effect as described a moment ago.

Tr. (proffer) at 1190:6–1191:4.  But in view of the Court's ruling, the trial record (and the jury) do not have the benefit of the proffered Exhibit 2202 or related testimony of Messrs. Ho, Randy Neeves, Tran, Doan, and Pham.

48

That evidence, of course, would have confirmed that Regal's replacement source code (which itself has no bearing on the central issues of ownership and implied license in this case) was created, in part, ***by decompilation of the unobfuscated original source code***.  On this, the law is clear: copying of source code that is created by decompilation is not copyright infringement.  *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1525-26 (9th Cir. 1992).

Additionally, that evidence would have helped the jury appreciate what Defendants continue to believe is true: that Mr. Nguyen (not Regal) was responsible for the mysterious DHL package on which Softketeers so heavily relied,[8] and that Mr. Nguyen (not Regal) was responsible for planting the "per Minh" instruction in Regal's replacement software source code.  The jury, however, was ***required*** to infer that Regal was somehow engaged in nefarious activities abroad—an inference that is ***highly prejudicial*** to Defendants and that is ***contrary to all actual evidence***.  Tr. (Randy Neeves) at 1293:4 ("It did not come from Regal."), 1293:15 ("We did not deliver source code to them."); Tr. (Ho) at 844:17–845:4 ("No."; "No."; "No.").

Individually and collectively, the Court's evidentiary rulings regarding the replacement software were highly prejudicial to Regal, may well have (mis)led the jury to the conclusions that Regal did not have rights in the software or that the replacement software was not properly created, and are reasons in and of themselves to grant Regal's request for a new trial.

### 4.    The Court Failed to Bifurcate Trial

Sensitive to these and other prejudicial themes that ultimately have no bearing on whether, as a matter of law, Regal has an ownership interest in or irrevocable implied license to the software, Defendants requested that the Court bifurcate the

---

[8]    Post-trial, Juror No. 3 stated that the mysterious DHL package was critical to the jury's ultimate verdict.

trial in this matter.  ECF No. 531 at 1 n.2.  The Court declined to do so.  ECF No. 737 at 18:7–8.  In view of the extensive prejudicial testimony, evidence and argument presented at trial regarding, e.g., a mysterious DHL package and the creation of replacement software, a new trial is warranted, separately and specifically on the issues of ownership and implied license.  *See Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 603 (9th Cir. 2016) (court abused discretion in failing to bifurcate compensatory damages phase, allowing "unduly prejudicial evidence" to be presented to the jury).

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants renewed motion for JMOL, setting aside the jury verdicts on the issues of copyright infringement and trade secret misappropriation; in the alternative, a new trial on the issues of ownership, copyright infringement and trade secret misappropriation; or, barring that, a remittitur.

Dated: March 17, 2023

Respectfully submitted,

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

By: */s/ Paul M. Schoenhard*

PAUL M. SCHOENHARD (pro hac vice)
paul.schoenhard@friedfrank.com
NICOLE M. JANTZI (pro hac vice)
nicole.jantzi@friedfrank.com
801 17th Street NW
Washington, DC 20006
Tel: 202-639-7254

HAWKINSON YANG LLP
MATTHEW J. HAWKINSON
mhawkinson@hycounsel.com
5670 Wilshire Boulevard, Suite 1800
Los Angeles, CA 90036
Tel: 213-634-0369

50

Attorneys for Defendants Regal West Corporation d/b/a Regal Logistics, Vu Ho Inc., Thai Tran Inc., Rand Neeves, Vu Ho, Thai Quoc Tran, Trung Ngoc Doan, and Dong Bao Pham

MEM. OF POINTS AND AUTHORITIES
RE RENEWED MOT. FOR JMOL OR A NEW TRIAL